**Monte BAKER and Lora Baker,
Plaintiffs-Appellants,**

v.

**MIDLAND–ROSS CORPORATION,
Defendants-Appellees.**

No. 1–885–A–206.

Court of Appeals of Indiana,
First District.

May 27, 1987.

Rehearing Denied July 10, 1987.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Melvin N. Fredbeck, LaGrange, Fredbeck & Deppe, Franklin, for plaintiffs-appellants.

James E. Rocap, Jr., James D. Witchger, Rocap, Reese & Dowling, Indianapolis, Stephen L. Huddleston, Franklin, for defendants-appellees.

RATLIFF, Chief Judge.

### STATEMENT OF THE CASE

Monte and Lora Baker appeal a negative judgment in favor of Midland-Ross on a personal injury action. We reverse.

### FACTS

Monte Baker was involved in an explosion which occurred on February 5, 1979. Monte was on his first day of work at the General Motors Delco Remy Plant Number 3 in Anderson, Indiana. The "Allcase" furnace which exploded was manufactured and sold by Surface Combustion, a division of Midland-Ross Corp., to Delco Remy in 1963. The furnace involved in the accident was one of six furnaces designed and initially installed pursuant to blueprints and recommendations of Midland-Ross. On the morning of the accident, Monte Baker and other supervisory personnel of General Motors were inspecting a line of electric heat treating furnaces, numbered one through six. When they were near furnace number four, a steam explosion occurred, burning Monte so severely as to render him totally and permanently disabled. At the time of the accident, Monte was thirty-nine (39) years old, earning over $31,000 per year

exclusive of benefits. Monte was married to Lora Baker. At the time of the incident, Monte was in a place where he had a right to be and was carrying out the duties of his employment.

The steam explosion occurred as a result of a water jacket bursting inside the furnace which was heated to 1700 degrees Fahrenheit. The water jacket contained three gallons of water. When the water and steam spewed into the furnace's interior, it contacted the 1700 degree coils, furnace walls, and parts which were being heat treated. This caused steam, fire and smoke to belch forth from the furnace, loosening the furnace door, and engulfing Monte in the steam and flames.

Immediately after the explosion, Delco Remy employees discovered that the inlet and outlet valves which regulated the flow of water into and out of the water jacket were closed. These valves were closed prior to the accident when Delco employees and other independent contractors shut down furnace number four for repairs. The furnace was relit on a Thursday; the furnace exploded on the following Monday. During that time, the water in the jacket apparently was never emptied. The 1700 degree heat from the furnace heated the water in the jacket, causing it to expand and burst the water jacket's walls.

The Allcase furnace was designed by Midland-Ross to heat treat metal parts. Heat treating requires a furnace which produces very high temperatures. For proper operation, a fan must circulate the gaseous air in the furnace's inner chamber. The fan has its propellers within the heat chamber. The fan's shaft extends into a water fan jacket which is suspended from the top of the furnace. The water jacket was designed to cool the fan bearings by the unrestricted flow of water through the jacket. Water would enter the jacket, circulate through the internal chambers of the fan jacket, and exit at the top of the water jacket through unrestricted piping for discharge into an open drain.

Midland-Ross' operating instructions for the furnace indicated that the operator should look for the unrestricted water flow through the "open-sight" drain on the outlet side of the water jacket before lighting the furnace. The instructions called for the operator to see that there were three gallons of water per minute flowing through the system during heat treatment.

Prior to the accident, the furnace's outlet drain was modified so that the water could be recirculated to save money. A valve was installed on this line to shut it off when necessary for repairs. The exact timing of this modification is unclear from the testimony. However, it is clear that Delco Remy employees made the modifications. Delco claimed that the change would not have been made without approval of the defendant's employees. Conversely, Midland-Ross claimed that the modification was made without consultation or notification to them. After the accident, Delco Remy removed the outlet valve and put back into operation the original unrestricted water flow system with the "open-sight" drain. As a result, Delco has had no explosions since.

Midland-Ross designed the "Allcase" furnace in the early 1950's. The furnace which exploded was sold to Delco Remy in 1963. The water jacket which actually burst was a replacement which Midland-Ross sold to Delco Remy in November of 1976.

It was undisputed that this water jacket was not designed as a pressure vessel. Midland-Ross designed and intended it to be used with an unrestricted flow of water through an "open-sight" drain which would relieve all pressure. Midland-Ross complied with safety standards of the industry and of the National Fire Protection Association by providing an "open-sight" drain.

The plaintiffs contended that Midland-Ross should have designed the water jacket to include a fail safe device such as a blow plug or relief valve which would have released built-up steam or pressure trapped in the jacket. They presented evidence that the cost of a blow plug would have been only a few dollars. Relief valves have been widely used ever since the advent of the steam engine in the 18th Century.

Midland-Ross disputed this claim, alleging that a relief valve was not needed for an "open-sight" cooling system. They presented evidence that there had been no steam explosions on any of the 1,000 Midland-Ross furnaces sold from 1950 through the date of the trial other than Delco Remy's furnace which had been modified. Also, it was uncontradicted that other furnace manufacturers similarly utilized water cooling systems without any pressure relief devices other than the "open-sight" drain. This was true even at the time of trial. Midland-Ross also claimed that a flow-through cooling system with an "open-sight" drain was the most reliable type of pressure relief since it used the least amount of mechanical parts.

Midland-Ross occasionally provided consulting services for the "Allcase" furnaces at Delco Remy's request. Delco would call Midland-Ross to their plant for a specific trouble call or repair. This was only after the Delco employees attempted in vain to internally solve the problem. While at Delco's plant, the Midland-Ross personnel were not allowed to perform any work themselves. They merely made recommendations to Delco employees who would implement those suggestions. Delco claimed, "Nothing was ever done unless it was approved by [Midland-Ross]." Appellants' Brief at 10. However, the defendant claimed that Delco made the last decision as to whether to follow the recommendations. Midland-Ross never had a maintenance contract with Delco.

Monte Baker and his wife Lora, filed suit against Midland-Ross on May 29, 1980, in the Marion County Superior Court for injuries and total permanent disability. The case thereafter was venued to the Johnson County Circuit Court. The complaint proceeded upon theories of strict liability and negligence. The jury trial commenced on February 2, 1985. Five days later, the jury found in favor of Midland-Ross.

## ISSUE

Although the Bakers raise numerous issues for our review, the following issue is dispositive:

Whether the trial court erred when it refused the plaintiffs' tendered instruction on the issue of negligence after negligence was tried by consent of the parties.

## DISCUSSION AND DECISION

The Bakers allege that the trial court's refusal to give one of their tendered jury instructions completely thwarted their effort to proceed upon the theory of negligence. The plaintiffs tendered the following instruction:

"Aside from the Instructions I have read or will read to you concerning the law respecting strict liability, the Plaintiffs may recover in this case under the theory of ordinary negligence if they establish, by a preponderance of the evidence, the following:

"1. That the Defendant provided repair, installation and consulting services to Plaintiff's employer, Delco Remy.

"2. Defendant, by and through its employees, knew in such capacity, or should have known, of a dangerous condition existing with respect to one of its products, and further knew or should have known that Plaintiff's employer, Delco Remy, relied upon it to point out any unreasonable dangers respecting said product in its capacity as a consultant and, it failed to warn or point out such unreasonably dangerous condition respecting its product to said customer.

"3. As a proximate result thereof, the Plaintiff, Monte Baker, was injured."

Record at 324. The plaintiffs allege that this instruction is a correct statement of the law based upon case law and Restatement (Second) of Torts § 324A (1965).[1]

1. "Liability to Third Person for Negligent Performance of Undertaking.

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

The Bakers allege that the trial court should have given their instruction because of the defendant's repair or consultation visits at the Delco plant. The plaintiffs allege that Midland-Ross should have seen that the furnace was modified and should have warned Delco of the resulting dangers. Thus, instead of attempting to prove a defect at the time of sale as required for liability under strict liability, this jury instruction was premised upon the defendant's post-sale negligence in servicing the furnaces and failure to warn of the dangerous modification.

The defendant claims that the trial court's refusal to give the negligence instruction was proper. Midland-Ross directs our attention to the trial court's preliminary instruction. Although the instruction was in very general terms, it apparently dealt only with the water jacket's design as defective at the time of sale. Nothing in the preliminary instruction specifically related to the defendant's post-sale negligence. The defendant alleges that the preliminary instruction was the result of pre-trial conferences and the plaintiffs' contentions and theories. Midland-Ross argues that this preliminary instruction prohibited the plaintiffs from raising the issue of negligence at trial.

■ Our resolution of this case revolves around the application of Trial Rule 15(B) of the Indiana Rules of Procedure. That rule provides as follows:

"(B) Amendments to conform to the evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

Pursuant to T.R. 15(B), issues not set out in the pleadings may be tried by express or implied consent of the parties. *State Exchange Bank v. Teague* (1986), Ind.App., 495 N.E.2d 262, 268–70; *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, 349–50, *trans. denied; Indianapolis Transit System, Inc. v. Williams* (1971), 148 Ind.App. 649, 658–59, 269 N.E.2d 543, 550, *trans. denied.* The function of the issues, whether formed by the pleadings, pre-trial orders, or contentions of the parties, is to provide a guide for the parties and the court as they proceed through the trial. Either party may demand strict adherence to the issues raised prior to trial. *Terre Haute Regional Hospital, Inc. v. El-Issa* (1984), Ind.App., 470 N.E.2d 1371, 1374, *trans. denied.* If the trial court allows introduction of an issue not raised before trial, an objecting party may seek a reasonable continuance in order to prepare to litigate the new issue. *Id.* However, where the trial ends without objection to the new issue, the evidence actually presented at trial controls. *Id.* Consequently, neither pleadings, pre-trial orders, nor theories proposed by the parties should frustrate the trier of fact from finding the facts which a preponderance of the evidence permits. *Ayr-Way Stores, Inc. v. Chitwood* (1973), 261 Ind. 86, 91, 300 N.E.2d 335, 339; *Indianapolis Transit*, 269 N.E.2d at 550; *Terre Haute Hospital*, at 1374; *James v. Brink and Erb, Inc.* (1983), Ind.App., 452 N.E.2d 414, 417–18; *Elkhart County Farm Bureau Coop.*

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

*Ass'n v. Hochstetler* (1981), Ind.App., 418 N.E.2d 280, 283.

There are, however, limits upon the principle of amending pleadings through implied consent. Fairness compels certain restraints. A party is entitled to some form of notice that an issue is before the court which was not pleaded before the trial. Without some notice, a party will not be deemed to have impliedly consented to its litigation. *Dotlich,* at 350; *Terre Haute Hospital,* at 1374; *Elkhart County,* at 283. This is particularly true where the new issue is not made absolutely clear by the evidence submitted. *Elkhart County,* at 283. Furthermore, a new issue may not be interjected under the pretense that the evidence was relevant to an already pleaded issue. *Dotlich,* at 350; *Elkhart County,* at 285. Thus, we must determine whether the evidence presented at trial put Midland-Ross on notice that the post-sale negligence theory was being introduced into litigation.

As Judge Garrard found, notice may take two forms. In *State Exchange Bank,* he wrote for the court as follows:

> "Notice can be overt, as where the unpleaded issue is expressly raised prior to or sometime during the trial but before the close of evidence. [Citation omitted.] Notice may also be implied where the evidence presented at trial is such that a reasonably competent attorney would have recognized that the unpleaded issue was being litigated. [Citation omitted.]"

*Id.* at 270.

Consent will be found if Midland-Ross had overt or implied notice that post-sale negligence was being presented at the trial. Midland-Ross contends that "much of the evidence that would be considered relevant to proving a strict liability theory must be allowed in, and yet, in retrospect could be argued to have been put into evidence simply to support a negligence theory." Appellee's Brief at 20. We agree with Midland-Ross that evidence of strict liability may overlap evidence of negligence. Nevertheless, the plaintiffs elicited a plethora of evidence at trial, without ob-

jection, which was relevant only to the issue of post-sale negligence, not strict liability.

Numerous witnesses testified that Midland-Ross acted as a consultant to Delco Remy. There was testimony that Delco always did what the defendant suggested and that Delco always heeded the defendant's warnings. In fact, one of Midland-Ross's employees testified that their customers relied upon them to give advice concerning safety measures. Counsel for Midland-Ross never objected to this testimony on the basis of being irrelevant to the issues being tried. The evidence related solely to Midland-Ross's post-sale negligence in acting as consultant and failing to warn Delco about a closed system.

At trial, the Bakers, without objection, introduced photographs showing the inlet and outlet valves. The purpose of the exhibits was to demonstrate that the valves easily were visible to anyone walking by the furnace. Although it might have been beneficial to the defense to show that the valves did exist, none of the questioning of witnesses about the obviousness of the closed system and the obviousness of the valves would have served any purpose for the Bakers other than to prove post-sale negligence.

The most blatant evidence concerning post-sale negligence constituted testimony from James Vick. Vick was considered one of the most knowledgeable employees at Midland-Ross for furnace maintenance. Upon direct examination by the plaintiffs, Vick testified that, had he been in the Delco plant, he would have seen that the furnaces had been modified to a closed, pressurized system and would have warned Delco to change them. The following colloquy took place:

> "Q. Did you have any trouble in seeing the area where the valves would have been if there had been any there?
>
> "A. No. They were adequately lit, you could tell by going by it.
>
> "Q. But suppose you had gone by there in '76 and seen some valves up there, what, if anything, would you have done?

"A. They would have been removed immediately.

"Q. So you would know if you didn't see an open site [sic] drain that there was something wrong, right?

"A. Right."

Record at 1302–03. Defendant's counsel did not object to this testimony which clearly was relevant only to post-sale negligence.

Vick went on to testify about a fellow employee at Midland-Ross, George Litenick. Litenick had been at the Delco plant a few days prior to the accident working on a furnace beside the one that exploded. Vick attempted to testify as to what Litenick saw or should have seen on that visit. On direct examination, counsel for the Bakers asked Vick, "[W]ould it be true that anybody in your position or any of the men that were sent out from [Midland-Ross] would know if they saw a closed system to warn somebody about it?" Record at 1303. The defendant objected to this question as calling for speculation. The defendant did not object on the basis that the question was irrelevant to the issues presented. The plaintiffs' counsel asked Vick several additional questions along this same theory to which the defendant objected solely on the basis of speculation. Vick's testimony in this regard was relevant only to post-sale negligence, not strict liability.

The purpose behind Trial Rule 15(B) is to provide parties with some flexibility in litigating a case, and to promote justice by permitting evidence brought in at trial to determine the liability of the parties. *Bank of New York v. Bright* (1986), Ind. App., 494 N.E.2d 970, 974; *Aldon Builders, Inc. v. Kurland* (1972), 152 Ind.App. 570, 580, 284 N.E.2d 826, 832. The evidence presented by the Bakers clearly indicated an action premised upon post-sale negligence as well as strict liability. Certainly, the defendant at least had implied notice that post-sale negligence was at issue.[2] "[A] reasonably competent attorney would have recognized that the unpleaded

issue was being litigated." *State Exchange Bank*, at 270. Consequently, the issue was tried by consent under T.R. 15(B).

The defendant does not dispute that the Baker's tendered instruction was a correct statement of the law. Indeed, it appears that the instruction was justified under the Restatement (Second) of Torts § 324A. Since the issue of post-sale negligence was tried by implied consent, the trial court committed reversible error when it refused the plaintiffs' tendered instruction on that issue.

Judgment reversed and remanded for a new trial.

ROBERTSON and NEAL, JJ., concur.

---

2. We also note that the plaintiffs' opening statement included remarks about post-sale negligence to which the defendant did not object.

Furthermore, the defendant's opening statement encompassed remarks about post-sale consultations.