In the Matter of V.C., Child in Need of Services.

Sarah Thomas, Appellant–Respondent,

v.

Christopher Carlson, Appellee–Respondent,

Marion County Department of Child Services (formerly Office of Family and Children), Appellee–Petitioner,

Child Advocates, Inc., Co–Appellee–Guardian ad Litem.

No. 49A04–0602–JV–86.

Court of Appeals of Indiana.

May 29, 2007.

Melanie Reichert, Broyles Kight & Ricafort, LLP, Indianapolis, IN, Attorney for Appellant.

Carey Haley Wong, Marion County Department of Child Services, Deborah M. Agard, Law Office of Deborah M. Agard, Indianapolis, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

Sarah Thomas ("Mother") appeals the trial court's adjudication of her daughter, V.C., as a Child in Need of Services ("CHINS") as well as the consolidation of the CHINS case with Christopher Carlson's ("Father") paternity action. Mother raises the following restated issues:

I.   Whether the trial court erred in consolidating the CHINS action with Father's paternity action;

II.  Whether the trial court erred in adjudicating V.C. as a CHINS on grounds different than those set forth in the CHINS petition;

III. Whether there is sufficient evidence to support the CHINS adju-

dication and the custody modification; and

IV.  Whether the trial court erred in awarding Father compensatory and punitive damages.

We affirm.

## FACTS AND PROCEDURAL HISTORY

V.C. was born on December 28, 1999. In October 2000, Father filed a petition to establish V.C.'s paternity. In January 2001, the trial court issued an order granting Father's petition, establishing V.C.'s paternity, and granting Father parenting time with V.C.

Between January 2001 and January 2004, usually just before or just after Father exercised overnight or extended visitation with V.C., Mother made numerous reports to Child Protective Services ("CPS") regarding Father's alleged sexual abuse of V.C. Eventually, in July 2004, the parties executed an Agreed Entry and Order, which provided that if there were further allegations of sexual abuse, Mother would take V.C. to an emergency room, physician, psychologist, or therapist before contacting CPS.

In May 2005, Mother took V.C. to therapist Donna Haram, ("Haram"). V.C. had been a patient of Haram's for over a year. Mother told Haram that V.C. had something to tell her. V.C. told Haram that Father had molested her. On May 11, 2005, Haram contacted CPS and reported the molestation. Later that month, following additional reports to CPS alleging neglect of V.C., the Marion County Department of Child Services ("DCS") filed a petition alleging that V.C. was a CHINS. The petition provided in part as follows:

5.   [V.C.] is a [CHINS] as defined in IC 31–34–1 in that: [V.C.'s] physical or mental condition is seriously impaired or

seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian[,] or custodian to supply the child with necessary food, clothing, shelter, medical care, education[,] or supervision; and [V.C.] needs care, treatment[,] or rehabilitation that [she] is not receiving and is unlikely to be provided or accepted without the coercive intervention of the [c]ourt, as shown by the following, to wit:

A) On or about May 17, 2005, the [DCS] determined, by its Family Case Manager[,] Joseph Combs, this child to be a [CHINS] because [Mother] has failed to protect [V.C.] from being molested by her father . . .

*Appellant's App.* at 194–95.

At the initial hearing on the petition, Father asked DCS to amend the CHINS petition to add the allegation that V.C. was a CHINS because Mother was endangering V.C.'s mental health. DCS responded that it could add an allegation regarding Mother but that it did not want to amend anything about Father. The trial court stated that it would not tell DCS what to put in the petition, and that DCS was free to amend it. Nothing further was mentioned, and the petition was never amended.

Shortly thereafter, in June 2005, Father filed a petition in the paternity action to modify custody of V.C. In the petition, Father alleged that Mother was coaching V.C. to fabricate the molestation accusations. Father also requested damages due to the alleged willfulness of Mother's actions.

On August 11, 2005, Father filed a motion to consolidate the paternity and CHINS cases, requesting that one fact-finding hearing be held on all issues related to the care of V.C. The trial court granted Father's motion, and on September 7 and 8, 2005, the trial court held a hearing on all matters pertaining to V.C.

On December 30, 2005, the trial court orally granted Father's petition for a custody modification, but ordered that V.C. temporarily be placed with her paternal grandmother pending issuance of the trial court's findings. Thereafter, on January 17, 2006, the trial court entered its judgment, which adjudicated V.C. a CHINS as to Mother, but not as to Father. The judgment is sixty pages long and contains more than four hundred and fifty-eight findings of fact and conclusions of law. We now highlight a portion of those findings and conclusions:

### Findings of Fact

A. Relevant History of Paternity Case and Previous Allegations of Abuse

* * *

244. [Mother] has exhibited unstable and/or erratic behavior on a continuing basis, which includes, but is not limited to:

(a) storing dead birds in her freezer;

(b) telling [Father] that she had miscarried his child six (6) weeks into her pregnancy, then showing him the purported fetus and burying it in his yard while performing some type of ceremony around a tree;

(c) drugging [Father] with sedatives she placed into cookies she had baked for him on the same day she allegedly terminated the relationship;

(d) demonstrating self-destructive behavior by slashing her abdomen with a locking blade knife and making a four (4) inch cut after [Alan Driver (Driver), her paramour,] told her his wife was pregnant with twins[;]

(e) telling [Driver's] wife[, Teresa,] that when she was not quite four (4) years old, a cousin or uncle who was

babysitting her had her give him a blow job, that this continued any time she was babysat by this person and that basically this is how she learned how to please a man—and that she has continued this pattern of bad behavior [throughout] her life and that she knew she had a problem and she needed help;

(f) [Mother] came to the [Drivers'] home, after [Mother] and Driver's extra-marital affair had ended and [the Drivers] had reconciled their relationship. [Mother] complained to them that they were not communicating with her, even though they had told her [to communicate with them] through their attorneys[.] [Mother] just showed up on their doorstep one day, saying she needed help [with naming Driver's child whom she had just born].

\* \* \*

B.   Current CHINS Allegations:

\* \* \*

258.  In the videotaped interview of [V.C.], [V.C.] appears to be [in] a school uniform being interviewed by [Linnette Garcia (Garcia), forensic child interviewer with the Child Advocacy Center]. [V.C.] appears as an extraordinarily beautiful, vivacious, precocious, engaging[,] and intelligent child.  When asked by the interviewer if she knows why she is here, [V.C.] first nods affirmatively and states[,] "because my daddy touches people on their private parts … [."] She goes on [to] recount that her dad is a bad, bad person, that he yells at people, that he yells at her mom, that her mom doesn't yell back at him—she just listens, that her mom and dad don't get along very well and her mom

is separated from her dad and her dad is separated from her mom; that her dad touches her private parts when he and she are naked, which she calls vagina, butt and boobies, with his hands; that she has seen him do this to her sister [B.], and that he has put his finger inside her vagina.  [V.C.] does not cry, hesitate, stutter, seem embarrassed, ashamed[,] or afraid in any manner.

259.  Dr. John Ehrmann [ (Dr. Ehrmann) ] and other lay witnesses testified that the content, time and circumstances of [V.C.'s] videotaped statement were inconsistent with a child who had actually experienced sexual abuse; but instead, were consistent with a child who was repeating something she had heard and had incorporated into her memories.

\* \* \*

264.  [Dr.] Ehrmann testified he reviewed the videotape of [V.C.'s] statement and found it "frankly highly atypical."  He noted that children who are this bright, this articulate, know this is a taboo area—and therefore there is usually [a] drop in eye contact, a drop in the volume of their speech, fear when they disclose sexual abuse.  "I see none of this in this child."

\* \* \*

266.  [Mother] has enrolled [V.C.] in treatment by three (3) counselors for alleged [sexual] abuse starting when she was two years, eight months of age.

267.  This treatment by three (3) different counselors from the age of [two] years, eight months through the age of five and one-half is quite unusual and was a cause of concern to all the

professionals who testified in this case.

* * *

275. [Mother] examined [V.C.'s] genitalia "on a fairly regular basis ... after visits with [Father]."

* * *

277. During the forensic interview concerning the allegations which form the basis for [the DCS's] CHINS action, [V.C.] did not exhibit the demeanor of a child who had been sexually abused; that is, she showed no shame, guilt, pain, nor anger. [V.C.] was more than willing to talk about the allegations, and "it all sounded rehearsed, memorized, like she had been coached."

* * *

282. [Father] denied ever having touched [V.C.] in a sexual manner.

* * *

286. Law enforcement declined to pursue charges against [Father] for the alleged molestation which is the subject of the instant CHINS action.

287. [Mother] presented no testimony that she had ever seen [Father] behave inappropriately toward [V.C.]; she testified that she never saw [Father] touch [V.C.] inappropriately, violently, or in any other manner that would corroborate the allegations.

288. [Mother] repeatedly stated that she would take any and all actions to exclude [Father] from [V.C.'s] life; and that she hated him and just wished he would die.

* * *

294. [Mother] lived with her parents before and after her six (6) month stay in her apartment. [Mother] had received a collection notice from the former apartment complex she resided in from July through December 2004.

* * *

296. [Mother] is currently unemployed and attending school to become an airplane mechanic....

* * *

317. The totality of the evidence further demonstrates that [Mother] has, through a lengthy pattern of delay and false accusations of sexual abuse of [V.C. by Father], consistently and constantly attempted to delay, thwart, impede and ultimately terminate [Father's] rights as a parent through the legal system, thereby costing him tens of thousands of dollars and precious time away from his daughters.

* * *

321. [Mother] has engaged in a pattern of behavior with respect to [Father's] relationship with [V.C.], which is harmful to the child's emotional and mental well-being. Such behavior has a detrimental effect upon [V.C.'s] relationship with her [f]ather, and ultimately, with her [m]other.

322. Mother's behavior has had a detrimental effect upon [V.C.'s] relationship with her sister[,] upon [V.C.'s] relationship with [Father's girlfriend,] and upon her relationship with [ ] her paternal grandmother.

* * *

[C]. Fact[-Finding] as to Allegation that [V.C.] is a Victim of Child Molestation by [Father]:

* * *

355. [The DCS] failed to prove [Father] had committed the crime of child molestation against [V.C.].

356. [The DCS] consequently failed to prove that [V.C. is] a child in need of services as to [Father].

* * *

358. [Mother's] acts of enrolling a less than three (3) year old child into therapy for sexual abuse where [V.C.] was constantly interrogated and educated about sexual abuse, [Mother's] subjecting [V.C.] to repeated invasive medical exams that a child under the age of six (6) should not have to undergo, and [Mother's] repeated examining [V.C.'s] genitalia on a regular basis for signs of [Father's] alleged sex abuse have caused psychological, emotional, and mental harm to [V.C.].

359. A person's character may be a material fact in deciding who should have custody of children, since fitness to provide care is of paramount importance. *In Re Matter of J.L.V., Jr.,* 667 N.E.2d 186, 190 (Ind.Ct.App.1996) ("When character has been put in issue by the pleadings in this type of case, evidence of character must be brought forth.")

* * *

364. [V.C.] has suffered, at a minimum, iatrogenic harm as a result of Mother's malicious campaign. Iatrogenic harm to a child results from, or contains components of overzealous professional intervention, repeated interviews or use of multiple interviewers, use of disclosure work by therapists, repeated physical examinations, possible declining standards of the child and family after disclosure, and "unnecessary" restrictions on access to or to visitation with the child. Lawlor, Richard J., J.D., Ph.D., "The Expert in Child Sex Abuse Cases: A Clinician's View" Expert Witnesses in Child Abuse Cases, Ceci and Hembrooke Ed's. APA:Washington D.C., 1998; 111, citing Jones, D.P.H. (1991) Professional and clinical challenges to protection of children. Child Abuse and Neglect, 15 (Suppl.1), 57–66.

* * *

368. Silence or equivocal response to an assertion made by another, which would ordinarily be expected to be denied is a tacit "admission"; the assertion and words or conduct are admissible if the reaction to the assertion is not clear denial. *Moredock v. State,* 441 N.E.2d 1372, 1374 (Ind. 1982). Mother never denied at trial that she coached [V.C.] to believe she had been sexually molested, and through her silence throughout the more–than–20–hours of evidence, she tacitly admitted to having coached [V.C.].

D. Intent of [Mother] to Falsely Report Sex Abuse:

369. "Intent," being a state of mind, is rarely susceptible of direct proof, but must ordinarily be inferred from the facts.

370. [Mother] made numerous false reports and claims of [sexual] abuse against [Father] prior to the allegations which form the basis for the instant case, which had as their aim severely limiting, if not terminating [Father's] contact with [V.C.].

371. Intent is a purely mental function and without a confession, it must be determined from a consideration of the conduct and the natural consequences of the conduct. The natural consequence of [Mother's] conduct in lodging false reports of [sexual] abuse against [Father] was the alienation of [V.C.] from [her father].

* * *

375. [IC] 31–33–22–3(b) permits awarding fees, costs, and punitive damages against a person who intentionally communicates to a law enforcement agency or to DCS a report of child abuse or neglect, knowing the report to be false. The amount of such damages and fees is left to the discretion of this [c]ourt.

376. Indiana law requires the awarding of compensatory damages as a prerequisite to recovery of punitive damages. *Sullivan v. Am. Cas. Co.*, 605 N.E.2d 134, 140 (Ind.1992).

* * *

381. The court finds that it has been shown in this case, by clear and convincing evidence that the Mother has acted with malice, fraud, willful and wanton misconduct, and/or oppressiveness which was not the result of a mistake of fact or law, mere negligence or other human failing on her part, when Mother intentionally reported, both directly and indirectly, to [DCS] allegations of child abuse, specifically that Father was molesting [V.C.], when she knew those reports to be false, and did so in a concerted and sustained effort to deny Father visitation with [V.C.] and to destroy his relationship with her.

* * *

383. The [c]ourt finds that [Father] incurred fees, costs and damages in the amount of $51,867.39, as a direct and proximate result of [Mother's] knowingly false reports to [DCS] and CPS that [Father] has been molesting their daughter, [V.C.].

384. The [c]ourt finds that [Father] is entitled to an award of compensatory fees, costs and damages pursuant to [IC] 31–33–2–3(b) against [Mother] in the amount of $51,867.39.

385. The [c]ourt further finds that the evidence established by clear and convincing evidence that [Mother] acted with malice, fraud, willful and wanton misconduct, or oppressiveness which was not the result of a mistake of fact or law, mere negligence or other human failing when she made knowingly false reports that [Father] was molesting [V.C. to the DCS] and CPS.

386. The [c]ourt therefore finds that in addition to an award of compensatory damages under [IC] 31–33–22–3(b), an award of punitive damages is also warranted and proper, not only to punish [Mother] for her long standing pattern of willful and wanton misconduct, but also to deter others from utilizing this "atomic bomb" of custody and parenting time battles: the false accusation that the non-custodial parent is sexually abusing his or her own children.

* * *

Modification of Custody

397. Under [IC] 31–14–13–6, this court may not modify a child custody order unless the modification is in the best interests of the child and there is a substantial change in one or more of the factors that the court may consider under IC 31–14–13–2, which include

the age and sex of the child; the wishes of the child's parents; the wishes of the child, the interaction and interrelationship of the child with her parents and any other person who may significantly affect the child's best interest; the child's adjustment to home, school, and community; and, the mental and physical health of all individuals involved.

398. The [c]ourt finds there has been a substantial and continuing change in circumstances which warrant a modification of custody and that a modification of custody is in [V.C.'s] best interests.

* * *

405. [Mother] exposed [V.C.] to her intimate relationship with a married man, within one month or less of meeting him. [Mother] then became impregnated by him and bore his son out of wedlock.

* * *

420. Ind.Code § 31–33–22–3 provides that a person who intentionally communicates to a law enforcement agency or local child protection service a report of child abuse or neglect, knowing the report to [be] false commits a Class A misdemeanor. However the offense is a Class D felony if the person has a previous unrelated conviction for making a report of child abuse or neglect knowing the report to be false.

* * *

Parenting Time

* * *

428. The [c]ourt orders that [Mother, Father, and V.C.] be evaluated by Dr. Richard Lawlor, Ph.D., J.D., and or-

ders that Dr. Lawlor render a written report to the [c]ourt, which shall include, but not be limited to:

a. A Parenting Assessment and Substance Abuse Evaluation of Father;

b. Recommendations for a therapeutic treatment plan for [Mother];

c. An assessment and evaluation of the needs of [V.C.];

d. Recommendations as to contact/visitation for [Mother] with [V.C.], times [therefore,] and circumstances under which it should occur;

e. Recommendations as to transitioning [V.C.] to physical custody of [Father];

f. Recommendations as to joint "family" counseling for [Mother, Father, and V.C.]; and

g. Recommendations as to any other arrangement (up to and including custody, if Dr. Lawlor believes that custody arrangement other than [that] ordered herein by this [c]ourt is in the best interests of [V.C.], after he has completed his evaluation) critical to the [c]ourt's fashioning a living arrangement and contact with both [ ] parents ...

429. [Guardian Ad Litem] is ordered to perform home study of [Father's] home and render a written report and photographs to the [c]ourt advising whether [Father's] home is a suitable and appropriate for [V.C.].

430. Until the items identified in paragraphs 428 and 429, supra, have been accomplished, the [c]ourt orders [V.C.] temporarily placed with paternal grandmother, [E.P.].

* * *

443. Additionally, [V.C.] is a [CHINS] as to [Mother's] acts and omissions that seriously endanger [V.C.'s] physical and mental health; and therefore, the CHINS action concerning [V.C.] shall remain open as to [Mother].

444. [Father] shall have the legal and physical custody of [V.C.], effective the 30th [of] December, 2005. However, as stated above, the child is ordered temporarily placed with paternal grandmother . . . until further order of this court.

445. Neither [Mother nor Father] is to have any contact with [V.C.] at paternal grandmother's home, until the [c]ourt is advised in writing by Dr. Lawlor what contact is appropriate and context, venue and circumstances therefore are recommended . . . a hearing will then be scheduled in short order to act on said recommendations.

*Appellant's Appendix* at 133–193.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Consolidation of CHINS and Paternity Actions

■ Mother first argues that the trial court erred in consolidating the CHINS and paternity actions because she had insufficient notice of the consolidation prior to the fact-finding hearing. Our review of the record of the proceedings reveals that Father filed his motion to consolidate on August 11, 2005, and the trial court granted it on August 15, 2005. The fact-finding hearing was not held until September 7, 2005. Mother had twenty-three days before the fact-finding hearing to either object to the consolidation or request a continuance. Because Mother did neither,

she has waived appellate review of this issue. *See City of New Haven v. Allen County Board of Zoning Appeals*, 694 N.E.2d 306, 313 (Ind.Ct.App.1998), *trans. denied*, (failure to object to consolidation results in waiver of the issue on appeal); *Patel v. State*, 533 N.E.2d 580, 585 (Ind. 1989) (failure to request continuance where it may be appropriate remedy results in waiver of the issue on appeal).

### II. Grounds for CHINS Petition

■ Mother next argues that the trial court erred in adjudicating V.C. a CHINS as to Mother on grounds different from those set forth in the CHINS petition. Specifically, although the CHINS petition alleged that V.C. was a CHINS because Mother failed to protect her from being molested, the trial court's order found V.C. was a CHINS because Mother's acts and omissions seriously endangered V.C.'s physical and mental health.

To resolve this issue we turn to Ind. Trial Rule 15(B), which provides in relevant part as follows:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence

would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

▆ Pursuant to T.R. 15(B), issues not set out in the pleadings may be tried by the express or implied consent of the parties. *Baker v. Midland–Ross Corp.*, 508 N.E.2d 32, 35 (Ind.Ct.App.1987), *trans. denied.* The function of the issues, whether formed by the pleadings, pre-trial orders, or contentions of the parties, is to provide a guide for the parties and the court as they proceed through trial. *Id.* Either party may demand strict adherence to the issues raised before trial. *Id.* If the trial court allows introduction of an issue not raised before trial, an objecting party may seek a reasonable continuance in order to prepare to litigate the new issue. *Id.* However, where the trial ends without objection to the new issue, the evidence actually presented at trial controls. *Id.* Consequently, neither pleadings, pre-trial orders, nor theories proposed by the parties should frustrate the trier of fact from finding the facts that a preponderance of the evidence permits. *Id.*

▆▆ Because fairness compels certain restraints, however, there are limits upon the principle of amending pleadings through implied consent. *Id.* at 36. For example, a party is entitled to some form of notice that an issue that was not pleaded is before the court. *Id.* Notice can be overt, as where the unpleaded issue is expressly raised prior to or sometime during the trial but before the close of the evidence, or implied, as where the evidence presented at trial is such that a reasonably competent attorney would have recognized that the unpleaded issue was being litigated. *Id.* (quoting *State Exchange Bank v. Teague*, 495 N.E.2d 262, 270 (Ind.Ct.App. 1986)).

Here, consent will be found if Mother had overt or implied notice that evidence was being presented that her acts or omissions were seriously endangering V.C.'s physical and mental health. Our review of the record of proceedings reveals that at the May 2005 initial hearing on the CHINS petition, three months before the fact-finding hearing, Father asked DCS to amend the CHINS petition to allege that V.C. was a CHINS because Mother was endangering V.C.'s mental health. Although DCS did not amend the petition, the request effectively notified Mother that the effects of her acts and omissions on V.C.'s mental and physical health could be at issue at trial.

Further, our review of the transcript reveals a plethora of evidence elicited without objection at trial that Mother had such notice. For example, testimony revealed that Mother engaged in a pattern of false accusations of sexual abuse against Father that was harmful to V.C. and had a detrimental effect upon V.C.'s relationship with both Father and his family. Testimony also revealed that Mother's acts of enrolling V.C. with three different sexual abuse therapists where she was constantly interrogated and educated about sexual abuse; subjecting V.C. to repeated invasive medical exams that such a young child should not have to undergo; and repeatedly examining her daughter's genitalia on a regular basis for signs of sexual abuse have caused psychological, emotional, and mental harm to V.C.

▆ The purpose behind T.R. 15(B) is to provide the parties with some flexibility in litigating a case, and to promote justice by permitting evidence brought in at trial to determine the liability of the parties. *Baker*, 508 N.E.2d at 37. The evidence presented in this case clearly indicates an issue regarding Mother's acts that serious-

ly endangered V.C.'s mental health. This issue was therefore tried by consent under T.R. 15(B), and the trial court did not err in adjudicating V.C. as a CHINS as to Mother on grounds different than those set forth in the CHINS petition.[1]

### III. Sufficiency of the Evidence

Mother next argues that there is insufficient evidence to support the CHINS adjudication and the custody modification. Because the same evidence supports both determinations, we will review them at the same time.

Because the trial court entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Freese v. Burns*, 771 N.E.2d 697, 700 (Ind.Ct.App. 2002), *trans. denied.* We first determine whether the evidence supports the findings, and then we determine whether the findings support the conclusions. *Id.* We may reverse only if the evidence does not support the findings or the findings do not support the judgment. *Id.* During our review, we may not reweigh the evidence or reassess the credibility of the witnesses. *Id.* Rather, we consider only the evidence favorable to the trial court's judgment. *Id.*

IC 31–34–1–2 provides that a child under eighteen years old is a CHINS if:

(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and

(2) the child needs care, treatment, or rehabilitation that the child:

(A) is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

DCS has the burden of proving by a preponderance of the evidence that V.C. was a CHINS. *See* IC 31–34–12–3.

As to the child custody modification, modifications of custody subsequent to a paternity determination are to be made according to IC Section 31–14–13–6, which provides:

The court may not modify a child custody order unless:

(1) modification is in the best interests of the child; and

(2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2 . . . of this chapter.

Section 2 of that chapter provides:

The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

---

**1.** Mother's reliance on *Maybaum v. Putnam County Office of Family and Children,* 723 N.E.2d 951, 955 (Ind.Ct.App.2000), is misplaced because there was no evidence in that case that an issue was tried by consent under T.R. 15(B).

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic violence by either parent.

(8) Evidence that a child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

The trial court in this case made four hundred and fifty-eight findings of fact and conclusions of law in a sixty page order. Mother challenges approximately thirty of the findings and conclusions. For simplicity, we review only those findings and conclusions necessary to support the CHINS adjudication and the modification of custody.[2]

### A. *Findings of Fact*

Mother argues that there is insufficient evidence to support several of the trial court's findings of fact. We address each of those relevant findings in turn.

■ Finding 267 states:

This treatment by three (3) different counselors from the age of 2 years, eight months through the age of five and one-half is quite unusual and was a cause for concern for all of the professionals who testified in this case.

*Appellant's App.* at 175. Our review of the evidentiary material reveals that DCS Family Case Manager Combs and Haram both testified that it was unusual and cause for concern that any child between those ages had been to three counselors. Thus, Finding 267 is supported by the evidence.

■ Finding 275 states:

[Mother] examined [V.C.'s] genitalia "on a fairly regular basis ... after visits with [Father]."

*Appellant's App.* at 176. Our review of the evidentiary material reveals that Haram testified that Mother told her that she examined V.C.'s genitals "on a fairly regular basis ... after visits with [Father]." *Respondent's Exhibit C* at 79. Haram's testimony supports the trial court's finding.

■ Finding 317 states:

2. Several of the trial court's challenged findings of fact are not necessary to support the CHINS adjudication and custody modification. For example, Mother argues that there is insufficient evidence to support the following findings of fact:

Finding 240. Mother bragged to her married paramour Alan Driver that she had drugged Father by placing sedatives in cookies, which she offered to Father and he subsequently ate, to remove [V.C.] from his home without his knowledge and consent. Finding 242. Mother placed a recording device into the vehicle of her then-paramour without his knowledge or consent. She then used the recordings she gathered to harass that individual and his wife when the relationship ended.

Mother claims there is insufficient evidence to support Finding 240, because even though she put sedatives in Father's cookies, she nev-

er bragged about doing it. She further claims there is insufficient evidence to support Finding 242 because even though she recorded conversations between the Drivers, she did not harass them. In fact, Mother claims that Mrs. Driver described Mother as the most cooperative person one could hope for when dealing with an unfaithful spouse.

We need not determine whether the evidence is sufficient to support the findings that Mother bragged about drugging Father and harassed the Drivers because they are not necessary to support the CHINS adjudication or custody modification. Rather, the important facts are that Mother drugged Father and placed a recording device in the Drivers' car. We therefore decline to review these findings and others like them. We also do not review any of the findings and conclusions regarding damages because we will discuss that issue in the following section.

The totality of the evidence further demonstrates that [Mother] has, through a lengthy pattern of delay and false accusations of sexual abuse of [V.C. by Father], consistently and constantly attempted to delay, thwart, impede and ultimately terminate [Father'] rights as a parent through the legal system, thereby costing him tens of thousands of dollars and precious time away from his daughters.

*Appellant's App.* at 180. Our review of the evidence reveals that Mother spent several years coaching V.C. to fabricate molestation allegations against Father. Two CHINS petitions were filed, one concerning V.C., and another concerning Father's younger daughter, and Father had to hire counsel to represent him, resulting in over $50,000 in legal fees. This evidence supports Finding 317.

█ Findings 321 and 322 state:

321. [Mother] has engaged in a pattern of behavior with respect to [Father's] relationship with [V.C.], which is harmful to the child's emotional and mental well-being. Such behavior has a detrimental effect upon [V.C.'s] relationship with her [f]ather, and ultimately, with her [m]other.

322. Mother's behavior has had a detrimental effect upon [V.C.'s] relationship with her sister[,] upon [V.C.'s] relationship with [Father's girlfriend,] and upon her relationship with [ ] her paternal grandmother.

*Appellant's App.* at 180. As previously noted, our review of the evidence reveals that, for several years, Mother coached V.C. to fabricate allegations that Father was molesting her. Clearly, such behavior is harmful to V.C., and has a detrimental effect on her relationship with Father and his family. Sufficient evidence supports the trial court's findings.

## B. *Conclusions of Law*

█ Having determined that the evidence supports the findings, we next consider Mother's argument that the findings do not support the trial court's conclusions.

Conclusion 364 states:

[V.C.] has suffered, at a minimum, iatrogenic harm as a result of Mother's malicious campaign. Iatrogenic harm to a child results from, or contains components of overzealous professional intervention, repeated interviews or use of multiple interviewers, use of disclosure work by therapists, repeated physical examinations, possible declining standards of the child and family after disclosure, and "unnecessary" restrictions on access or to visitation with the child. Lawlor, Richard J., J.D., Ph.D., "The Expert in Child Sex Abuse Cases: A Clinician's View" Expert Witnesses in Child Abuse Cases, Ceci and Hembrooke Ed's. APA: Washington D.C., 1998; 111, citing Jones, D.P.H. (1991) Professional and clinical challenges to protection of children. Child Abuse and Neglect, 15 (Suppl.1), 57–66.

*Appellant's App.* at 184. Mother argues that because the article cited Conclusion 364 was not admitted into evidence, she was not able to challenge the validity of the work. However, the article is cited to define the term "iatrogenic" and to support the testimony of an expert witness, not for the content or validity of the article. We find no error.

Next, Conclusion 368 states:

Silence or equivocal response to an assertion made by another, which would ordinarily be expected to be denied[,] is a tacit "admission"; the assertion and words or conduct are admissible if the reaction to the assertion is not clear denial. *Moredock v. State,* 441 N.E.2d 1372, 1374 (Ind.1982). Mother never de-

nied at trial that she coached [V.C.] to believe she had been sexually molested, and through her silence throughout the more–than–20–hours of evidence, she tacitly admitted to having coached [V.C.].

*Appellant's App.* at 184. Mother's sole contention regarding this conclusion is that she was never asked whether she coached or coerced V.C. and therefore did not have the opportunity to admit or deny this behavior. However, our review of the evidentiary materials reveals that Mother did have the opportunity to deny, and in fact did deny that she coached or coerced V.C. The trial court simply did not believe her, and this court does not reweigh the evidence. See *Freese,* 771 N.E.2d at 700. We find no error in the trial court's findings of fact and conclusions of law.

## IV. Damages

■ The trial court ordered Mother to pay Father $51,867.39 in compensatory damages and $50,000.00 in punitive damages. The $51,867.39 represents the cost of Father's attorney and legal fees from the May 2005 filing of the CHINS petition through the end of trial. The trial court awarded the damages pursuant to IC Section 31–33–22–3, which provides as follows:

(b) A person who intentionally communicates to:

(1) a law enforcement agency; or

(2) the department;

a report of child abuse or neglect knowing the report to be false is liable to the person accused of child abuse or neglect for actual damages. The finder of fact may also award punitive damages and attorneys fees in an amount determined by the finder of fact against the person.

Mother argues that the trial court erred in ordering her to pay these damages. She relies on the fact that it was Haram and not Mother that reported the abuse to

DCS. Mother specifically points out that the trial court found that she was not in contempt of the July 2004 agreed entry that required her to follow certain protocol before reporting alleged abuse. Mother appears to argue that if she was not in contempt of the order, she could not have violated the statute.

■ However, the agreed entry and the statute include two separate standards. The agreed entry provides that Mother will take V.C. to a professional before reporting abuse. Mother complied with this order by taking V.C. to Haram rather than reporting the abuse herself. The statute, on the other hand, imposes liability on one who intentionally communicates an abuse report knowing the report to be false. Communication can be either direct or indirect. See e.g., *Quality Foods, Inc. v. Holloway Assocs. Prof'l Eng'rs and Land Surveyors, Inc.,* 852 N.E.2d 27, 32 (Ind.Ct. App.2006) (stating principal's direct or indirect communication can install a reasonable belief in the mind of a third party that another individual is his agent).

Here, Mother indirectly communicated an abuse allegation to DCS through Haram when she coached and encouraged V.C. to report sexual abuse allegations that Mother knew to be false, and which Mother knew Haram would be required to report. We find no error in the award of damages.

■ Lastly, Mother argues that there is no evidence to support the damages award. However, our review of the evidence reveals a Supplemental Affidavit of Attorneys Fees and Costs detailing costs accrued from the date of the filing of the CHINS petition through trial. *Appellant's App.* at 85. This affidavit, which was completed by Father's attorney and admitted into evidence without objection, and which includes an attached itemized statement,

provides that Father's legal fees for the time period were $51,867.39. This evidence supports the $51,867.39 damages award.

Affirmed.

FRIEDLANDER, J., concurs.

RILEY, J., dissents with separate opinion.

RILEY, Judge, dissenting.

I respectfully dissent from the majority because (1) I do not believe Father's request to amend the CHINS petition effectively notified Mother that the threat she posed to V.C. would be an issue at trial, and (2) I believe it was improper to consolidate the CHINS action with Father's paternity and custody action.

Indiana Code § 31–34–9–3 requires, in part, that a CHINS petition contain a concise statement of the facts upon which the allegations are based, including the date and location at which the alleged facts occurred. In the present case, the DCS included within its petition a single statement that on or about May 17, 2005, Mother failed to protect V.C. from molestation by Father. However, in light of the trial court's determination that V.C. was not molested by Father, Mother now claims, and I agree, that she could not have failed to protect V.C. from being molested. Accordingly, the DCS did not present evidence to substantiate the allegation within its CHINS petition.

Although I recognize that a CHINS finding need only be supported by sufficient evidence that a child is in need of services as defined in the CHINS statute, this court has previously held that in setting out the mandatory contents of a CHINS petition, I.C. § 31–34–9–3 serves to give parents notice of the allegations and the opportunity to contradict the DCS's case. *T.Y.T. v. Allen County Div.* *of Family and Children,* 714 N.E.2d 752, 756 (Ind.Ct.App.1999); *Maybaum v. Putnam County Office of Family & Children,* 723 N.E.2d 951, 954 (Ind.Ct.App.2000). Therefore, I believe there must be a reasonable level of congruence between the factual allegations in the CHINS petition and the evidence presented at the CHINS hearing. As a result, here, I would have required the DCS to amend their petition to reflect the entirety of the allegations against Mother.

Also, despite it being arguable that Mother impliedly consented to trial of her mental instability, I am unable to ignore that the hearing in this case involved a consolidation of two separate actions with two separate categories of evidence: (1) the evidence put forth by the DCS as to the CHINS action; and (2) the evidence presented by Father in support of his paternity and custody action. This court has previously declared that one of the purposes of the Indiana Juvenile Code is "to provide a judicial procedure that insures fair hearings and recognizes and enforces the constitutional and other legal rights of children and their parents." *Roark v. Roark,* 551 N.E.2d 865, 868 (Ind.Ct.App. 1990). We have always been particularly concerned where there are procedural irregularities in a CHINS proceeding, as they may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights. *In re J.Q.,* 836 N.E.2d 961, 967 (Ind.Ct.App.2005). In my view, unless the trial court in the present case was able to keep the evidence and the issue to which that evidence belonged distinct in its mind, there was ample room for confusion in the procedure of this matter. As a result, due to the potentially devastating consequences of a CHINS determination, trial courts should examine CHINS causes independently from all oth-

er actions. Accordingly, I would have reversed and remanded this case to the trial court with instructions to hold a hearing on the CHINS petition separate from Father's paternity and custody action.