## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 30 2020, 9:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

L.J.Y. (Minor Child),

And

J.Y. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 30, 2020

Court of Appeals Case No. 19A-JC-1652

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

The Honorable Lori K. Morgan, Magistrate

The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause No. 02D08-1809-JC-493

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.Y. (Father), appeals the trial court's adjudication of his minor child, L.J.Y. (Child) as a Child in Need of Services (CHINS).[1]

We affirm.

# ISSUES

Father presents three issues on appeal, which we restate as the following four issues:

(1) Whether the trial court erred by conducting the factfinding hearing outside the statutory timeframe;

(2) Whether the trial court erred by failing to complete the dispositional hearing within the timeframe mandated by Indiana statutes;

(3) Whether the trial court abused its discretion by granting the Appellee-Petitioner, Department of Child Services' (DCS) motion to have the CHINS petition conform to the evidence; and

(4) Whether the evidence was sufficient to support the trial court's CHINS adjudication.

---

[1] J.K., Child's mother (Mother), does not participate in this appeal.

# FACTS AND PROCEDURAL HISTORY

[4] Child was born on May 30, 2002. When Child was about four years old, she was removed from Mother's care due to neglect, and was placed with Father, and S.M. (Stepmother) who reside in Fort Wayne, Indiana.

[5] Sometime in May 2018 or the first day of her summer break, Child was making breakfast in the kitchen. She then left the home in order to get syrup from her grandmother's house which was nearby, however, no one was at her grandmother's home, so she returned home. When she got home, Father asked her where she had been. A verbal altercation ensued, and Father "grabbed [Child] by her hair, swung her around on the floor, and hit her in the head" about "seven or eight times." (Appellant's App. Vol. II, p. 46, Tr. Vol. II, p. 71). Child blacked out for a few seconds after being struck in the head.

[6] On August 22, 2018, DCS received its first report regarding a heated argument between Father and Child relating to Child's boyfriend. On August 28, 2018, family case manager Jennifer Medina (FCM Medina), interviewed Father regarding the allegation. Father expressed his frustration regarding Child, claiming that she was sneaking out of the house at 2:00 a.m. "to be with her boyfriend." (Appellant's App. Vol. II, p. 26). On the same day, FCM Medina interviewed Child. Child stated that Father had "physically abused her in May of 2018 by pulling her hair and hitting her in the head." (Appellant's App. Vol. II, p. 25). Child stated that Father would call her a "cunt and bitch" and he talked ill of her Mother. (Appellant's App. Vol. II, p. 27). Child stated that Father's verbal abuse had her to "the point where she wants to" harm herself.

(Appellant's App. Vol. II, p. 25). During the interview, FCM Medina did not observe any marks, bruises, or welts on Child.

[7] On September 12, 2018, Child missed part of her school day since she had issues with her birth control and was supposed to see her gynecologist. However, after her appointment, Child was expected to go to school. Father drove Child to the appointment. On their way, Child asked Father whether she could go with her sister and two nephews to the pumpkin patch. Father then yelled at Child and stated that she never wanted to do things with him, and he expressed concern that she was not home much. They went to the appointment and when the appointment was over, they returned to the car. On their ride to Child's school, Child stated, "why is my life everything you want." (Tr. Vol. II, p. 75). That statement "set [Father] off." (Tr. Vol. II, p. 75). Out of anger, Father took his seatbelt off and "kind of swerved the car and lunged at [Child]." (Tr. Vol. II, p. 75). The vehicle that was driving behind drove up beside Father's car and the occupants stated that they were calling the police. When the car stopped, Child attempted to get out of the car, however, Father threatened to beat Child, so she remained in the car. When the police arrived, Father got out of the car, and Child locked the door. The police convinced Child to open the door and they later transported her to school.

[8] On September 19, 2018, Child's school contacted DCS to report that Child had a "bruise on her thigh." (Appellant's App. Vol. II, p. 25). Child informed FCM Medina that Father had punched her on her right thigh "because she [had] asked for help with her homework." (Appellant's App. Vol. II, p. 25).

FCM Medina observed the "bruise to be [greenish-yellow] in color[,] and was large and round." (Appellant's App. Vol. II, pp. 25-26). FCM Medina took pictures of the bruise in the bathroom. FCM Medina then interviewed Father over the phone. Father denied physically abusing Child, but he claimed that he had verbally scolded her in front of Stepmother since Child had sought last minute help with an eight-page assignment which was due the next day. Father added that his children, including Child, knew the "system and [knew] what to say to get him in trouble" with DCS. (Appellant's App. Vol. II, p. 26). When FCM Medina requested that Father pick up Child from school due to the incident, Father refused. Prior to suspending the phone call, Father blurted, "You know what, I don't even want her back in my home, this is enough, just keep her." (Appellant's App. Vol. II, p. 26). Another FCM contacted Father to confirm that he did not want Child in his home. Father was "extremely irate [] and throughout the call" he "was yelling more than talking." (Appellant's App. Vol. II, p. 26). When the FCM conveyed that Father's yelling was needless, Father hung up. Since Father refused to pick up Child from school, FCM Medina transported Child to the Youth Services Center, and she was subsequently placed in foster care.

[9] On September 21, 2018, the trial court held a preliminary hearing regarding allegations of Father's neglect and physical abuse to Child. Father and Stepmother were present for that hearing. DCS presented evidence that it had received three reports relating to Father's physical abuse of Child. First, DCS claimed that Child had reported that Father had "grabbed [her] by the hair,"

swung her "around on the floor" and "hit her in the head." (Tr. Vol. II, p. 7).
DCS added that on September 12, 2018, Father "struck" Child on her thigh
causing her to have a bruise. (Tr. Vol. II, p. 7). DCS also presented pictures of
the bruise. DCS further stated that Child had "reported being afraid to go back
home due to physical . . . abuse in the home" and that she was having
"ideations [] of self-harm." (Tr. Vol. II, p. 7).

[10] The trial court found that probable cause existed, found that Child was a
CHINS, and it authorized DCS to file a CHINS petition. DCS served Father
with the CHINS petition in court that day. After Father denied the allegations,
the trial court ordered Child to remain in foster care and participate in a clinical
assessment. Father was then directed to refrain from criminal activity, maintain
a clean and stable home, cooperate with all caseworkers, attend all meetings,
and participate in various services. In response to the court ordered services,
Father stated

> Well Your Honor I've been involved with DCS for about 20
> years so I doubt that any of the services that they can provide or
> suggest[ed] to me are going to help because I've probably done
> every single one of their classes and to add a little bit more on top
> of that[,] the majority of those classes have asked me to come
> back and instruct their classes.

(Tr. Vol. II, p. 13). During further discussion with the trial court, Father's voice
was "escalating in tone," and it progressed to "an angry loud tone." (Tr. Vol.
II, p. 15). Father's final words were, "You've railroaded my entire life[,] 20

years of my fuckin life man." (Tr. Vol. II, p. 15). At that point, the trial court adjourned the hearing.[2]

[11] On October 15, 2018, the trial court conducted an additional initial hearing. Child, GAL Jennifer Young (GAL Young), Father's attorney, Stepmother, and Stepmother's counsel were present. Initially, Father was present, but he was escorted out by security since "he was agitated . . . and being loud." (Tr. Vol. II, p. 17). During the hearing, DCS requested and was granted leave to amend its CHINS petition to include Stepmother as a party since she was also Child's caregiver. GAL Young then reported that Child was "doing really well" in foster care and "there were no issues or concerns." (Tr. Vol. II, p. 20). At the close of the hearing, the trial court discussed upcoming hearing dates. Everyone agreed that an additional initial hearing was necessary and was scheduled for November 27, 2018. Also, the trial court scheduled a factfinding hearing for January 10, 2019.[3] None of the parties, including Father, objected or otherwise stated the factfinding hearing was scheduled past the sixty-day statutory timeframe.

[12] On November 19, 2018, DCS filed a Second Amended CHINS petition. The material facts pertaining to Father's, Mother's, and Stepmother's neglect were

---

[2] The record shows that on October 12, 2018, DCS amended the CHINS petition and included facts pertaining to Mother's neglect of Child.

[3] According to Indiana Code section 31-34-11-1(a), a factfinding hearing should not be scheduled more than sixty days after the CHINS petition has been filed. Indiana Code section 31-34-11-1(b) further provides that the trial court may extend the time to complete the factfinding hearing by an additional sixty days if all the parties consent to further time.

included in that petition. On November 27, 2018, during the hearing, the trial court realized that scheduling a factfinding in January 2019 would be outside the statutory timeframe mandated under Indiana Code section 31-34-11-1(a). Believing that the parties had consented to the scheduling of the factfinding hearing outside the sixty-day statutory timeframe, the trial court questioned whether "the parties have waived the [sixty-day] requirement." (Tr. Vol. II, p. 30). DCS's counsel immediately responded by stating, "I believe so." (Tr. Vol. II, p. 30). Despite the absence of such a waiver, Father's counsel did not object to DCS's response. Following that hearing, the trial court issued an order, scheduling the factfinding for January 10, 2019 and January 17, 2019. The order noted that the "parties waive[d] the requirement that [f]actfinding be completed within sixty days." (Appellant's App. Vol. II, p. 65).

[13] On January 10, 2019, the parties were present at the factfinding hearing, but the matter was continued to January 15, 2019. As of the day of that hearing, Child did not feel safe to go back to live with Father. She felt that if she went back to Father's home things would go from bad to worse. Child stated that since she moved out of Father's home in September 2018, she has never been happier. She testified that her "anxiety has lessened," she was no longer depressed, she had gotten a job, and was saving up money to buy herself a car. (Tr. Vol. II, p. 83). The factfinding hearing was then continued to January 17, 2019 and was concluded on the same day.

[14] While the DCS's CHINS petition was founded on claims of neglect pursuant to Indiana Code section 31-34-1-1, DCS sought to add an allegation of abuse

pursuant to Indiana Code section 31-34-1-2 in light of all the evidence presented regarding Father's physical abuse to Child. Thus, at the close of the DCS's case-in-chief, and pursuant to Indiana Trial Rule 15(B), DCS moved to amend its petition to conform to the evidence. Over Father's objection, the trial court granted DCS's request. On April 15, 2019, the trial court issued an Order, adjudicating Child as a CHINS pursuant to Indiana Code sections 31-34-1-1; and -2. An initial dispositional hearing was scheduled for April 29, 2019. Father was not present, but his newly appointed attorney was, and she requested a continuance claiming that it was in Father's "best interest." (Tr. Vol. II, p. 180). On June 18, 2019, the trial court held and concluded the dispositional hearing. The following day, the trial court issued its dispositional order.

[15] Father now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Timeliness of the Factfinding Hearing*

[16] Father contends that the trial court erred when it held the factfinding hearing outside the mandated statutory timeframe. Indiana Code section 31-34-11-1, provides, in relevant part that:

> (a) Except as provided in subsection (b), unless the allegations of a petition have been admitted, the juvenile court shall complete a factfinding hearing not more than sixty (60) days after a petition alleging that a child is a child in need of services is filed in accordance with [I.C. §] 31-34-9.

(b) The juvenile court may extend the time to complete a factfinding hearing, as described in subsection (a), for an additional sixty (60) days *if all parties* in the action consent to the additional time.

* * * *

(d) If the factfinding hearing is not held within the time set forth in subsection (a) or (b), *upon a motion with the court*, the court shall dismiss the case without prejudice.

(Emphasis added). *In re J.S.*, 133 N.E.3d 707, 712-13 (Ind. Ct. App. 2019), we held that

> the General Assembly clearly intends for the timeframe set forth in Indiana Code section 31-34-11-1 to be a certain deadline. Further, while subsection (a) provides that the parties may waive the initial 60-day deadline by agreeing to a continuance, subsection (b) does not include any such provision. This lack of allowance for an additional extension of time indicates that the General Assembly intends to require that a factfinding hearing must be completed within 120 days of the filing of a CHINS petition regardless of any act or agreements of the parties. To allow the parties to agree to dates beyond the maximum 120-day limit would thwart the legislative purpose of timely rehabilitation and reunification of families that are subject to CHINS proceedings.

[17] In the present case, on September 21, 2018, DCS filed a CHINS petition. During an initial hearing on October 15, 2018, twenty-four days after that filing, Father was initially present, but he had to be removed from the court room due to his disruptive behavior. Father's counsel, however, was present during the

hearing.  At the close of the hearing, a discussion ensued as to available hearing dates.  All parties agreed that an additional initial hearing was needed, and it was scheduled for November 27, 2018.  The parties also agreed to a factfinding hearing to be completed on January 10, 2019, which was 111 days after DCS filed its CHINS petition.  Father's counsel did not object to the fact that the CHINS factfinding hearing was being scheduled beyond the sixty-day statutory timeframe or argue that the parties had not consented to an additional sixty days.  *See* I.C.§§ 31-34-11-1(a), (b).

[18]   At the additional initial hearing on November 27, 2018, the trial court reiterated the scheduling of the factfinding hearing on January 10, 2019.  The trial court noted that more than sixty days had lapsed since the filing of the CHINS petition.  The trial court then assumed that "the parties have waived the [sixty-day] requirement." (Tr. Vol. II, p. 30).  DCS's counsel responded that he believed the parties had agreed to such a waiver.  While the record contains no such waiver, Father's counsel did not raise any objection.  Following that hearing, the trial court issued an order scheduling the factfinding to be held on two days—January 10, 2019 and January 17, 2019.  In the order, the trial court restated that the parties had "waive[d] the requirement that [f]actfinding be completed within sixty days." (Appellant's App. Vol. II, p. 65).  On January 3, 2019, a case management hearing was held, and Father did not argue that the January 10, and 17, 2018 factfinding hearings were outside the hearing requirement set forth in Indiana Code section 31-34-11-1(a), or that the parties did not consent to an additional sixty days to complete the factfinding hearing

pursuant to Indiana Code section 31-34-11-1(b). On January 10, 2019, the parties were present at the factfinding hearing, but the matter was continued to January 15, 2019. The factfinding hearing was ultimately conducted on two days—January 15, and 17, 2019, which was 116 days after the CHINS petition had been filed. At no point did Father object to the untimely nature of the factfinding hearing.

[19] *In re J.S.*, 133 N.E.3d at 713 we concluded, in part, that the CHINS statutory scheme provides mandatory deadlines and includes enforcement mechanisms. "This is not to say that the enforcement mechanisms are self-executing and a party can stand idly by until an adverse determination has been made. A party must preserve the right of expediency by filing a written motion to dismiss before the merits of a petition are litigated." *Id.*

[20] Father had some cognizable duty to challenge the untimely nature of the factfinding hearing during the initial hearings, which he failed to do. Additionally, not only did Father fail to object to the placing of the factfinding hearing outside the statutory timeframe, he did not file a motion with the court to dismiss the CHINS petition as Indiana Code section 31-34-11-1(d) mandates, thus, he invited the error. *See Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 657 (Ind. Ct. App. 2008). "The doctrine of invited error is grounded in estoppel and precludes a party from taking advantage of an error that he or she commits, invites, or which is the natural consequence of his or her own neglect or misconduct." *Id.* (citing *Balicki v. Balicki*, 837 N.E.2d. 532, 541 (Ind. Ct. App. 2005), *trans. denied*).

Father then argues that even if he waived compliance with the timeframes, the trial court committed *fundamental error* by not *sua sponte* dismissing the CHINS case once the sixty-day timeframe was exceeded. The fundamental error doctrine is a narrow exception to the waiver doctrine and applies to an "error that was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal." *In re G.P.*, 4 N.E.3d 1158, 1167 n. 8 (Ind. 2014). For an appellate court to overturn a trial court ruling based on fundamental error, the error must have been "a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively." *S.M. v. Elkhart Cnty. Office of Family & Children*, 706 N.E.2d 596, 600 (Ind. Ct. App. 1999) (citation omitted).

Even if the trial court's decision to conduct the factfinding hearing outside the statutory timeframe amounted to error, the harm for such error was not substantial enough to rise to the level of fundamental error. The record reveals that at an initial hearing in November 2018, the trial court noted that the scheduling of the factfinding hearing in January 2019 would be outside the timeframe set by Indiana statutes. DCS indicated that there was a waiver in place, and the trial court issued an order stating that the parties had waived the holding of the factfinding hearing beyond the sixty-day period. Moreover, Indiana Code section 31-34-11-1(d), spells out the enforcement mechanism of an aggrieved party. That section requires the trial court to dismiss the CHINS

action *if a motion is filed with the court*. Father failed to file a motion to dismiss and the trial court acted on Father's wavier. Under such circumstances, Father cannot complain that the factfinding hearings were held outside the statutory framework. Nor has Father identified any actual prejudice to his ability to present his case as a result of the delay. Thus, Father has not established that fundamental error occurred, and we hold that the trial court's failure to complete the factfinding hearing on DCS's CHINS petition within the statutory timeframe did not constitute error.

## II. *Timeliness of the Dispositional Hearing*

[23] Father additionally contends that the trial court erred when it held the dispositional hearing more than thirty days after the CHINS finding. In response, DCS claims that Father waived his right to challenge the setting of that dispositional hearing outside the statutory timeframe.

[24] Indiana Code section 31-34-19-1(a) governs dispositional hearings and provides, in relevant part that "The juvenile court shall complete a dispositional hearing not more than thirty (30) days after the date the court finds that a child is a child in need of services . . ." Indiana Code section 31-34-19-1(b) continues to state that "if the dispositional hearing is not completed in the time set forth in subsection (a), upon filing of a motion with the court, the court shall dismiss the case without prejudice." After the trial court entered its Order on the factfinding hearing on April 15, 2019, it only had thirty days to conduct a dispositional hearing.

[25] The record shows that an initial dispositional hearing was scheduled for April 29, 2019. Father was not present, but Father's newly appointed counsel was, and she requested a continuance since she had not had a chance to review the case or consult with Father. In fact, Father's counsel stated that it was in Father's "best interest" that the dispositional hearing be continued. (Tr. Vol. II, p. 180). Based on Father's counsel's argument, the trial court questioned the parties as to whether they were waiving the "statutory time frames" for the dispositional hearing. (Tr. Vol. II, p. 180). All parties, including Father, did not object to the rescheduling of the dispositional hearing outside the thirty-day timeframe.

[26] We agree with DCS that Father waived his right to challenge the untimely completion of the dispositional hearing. *See Plank v. Cmty. Hospitals of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) (our supreme court held that "waiver" connotes an "intentional relinquishment or abandonment of a known right.") Further, Indiana Code section 31-34-19-1(b) requires that if a dispositional hearing is not held within thirty days of the CHINS order, "upon a motion," the matter shall be dismissed without prejudice. Father failed to file a motion to dismiss the CHINS case. Thus, Father cannot be afforded relief in this appeal.

### III. *Amendment of the CHINS Petition*

[27] Next, we address Father's argument that the trial court abused its discretion when it permitted DCS to amend its CHINS petition during the factfinding hearing.

[28] We note that DCS's Second Amended CHINS petition only alleged claims of neglect against Father pursuant to Indiana Code section 31-34-1-1( which requires proof that Child's physical or mental health is seriously impaired or endangered as a result of the inability, refusal, or neglect of the parent, guardian, or custodian.)  Prior to resting its case, DCS sought to amend its CHINS petition under Trial Rule 15(B) so that the petition could "conform to the evidence." (Tr. Vol. II, p. 144).  With the amendment, DCS sought to include Indiana Code section 31-34-1-2, which requires proof that Child's physical or mental health is seriously endangered due to injury by the act or omission of Child's parent, guardian, or custodian.  Over Father's objection, the trial court permitted the last-minute amendment.  On appeal, Father argues that throughout the factfinding hearing, DCS focused on contentions that he neglected Child.  Thus, Father contends that DCS's late amendment did not afford him adequate notice that assertions pertaining to physical abuse to Child would be presented, and he argues that he was prevented from preparing an adequate defense.

[29] Amendments to pleadings are to be liberally allowed. *MAPCO Coal, Inc. v. Godwin*, 786 N.E.2d 769, 777 (Ind. Ct. App. 2003).  The trial court retains broad discretion in granting or denying amendments to pleadings, and we will reverse on appeal only when it abuses that discretion. *Id.* "An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has

misinterpreted the law." *Fleming v. Int'l Pizza Supply Corp.*, 707 N.E.2d 1033, 1036 (Ind. Ct. App. 1999), *trans. denied*.

[30] Trial Rule 15(B) provides as follows

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

[31] Pursuant to T.R. 15(B), issues not set out in the pleadings may be tried by the express or implied consent of the parties. *Baker v. Midland-Ross Corp.*, 508 N.E.2d 32, 35 (Ind. Ct. App. 1987), *trans. denied*. The function of the issues, whether formed by the pleadings, pre-trial orders, or contentions of the parties, is to provide a guide for the parties and the court as they proceed through trial. *Id*. Either party may demand strict adherence to the issues raised before trial. *Id*. If the trial court allows introduction of an issue not raised before trial, an objecting party may seek a reasonable continuance in order to prepare to litigate the new issue. *Id*. However, where the trial ends without objection to the new

issue, the evidence presented at trial controls. *Id*. Consequently, neither pleadings, pre-trial orders, nor theories proposed by the parties should frustrate the trier of fact from finding the facts that a preponderance of the evidence permits. *Id*.

[32] Because fairness compels certain restraints, there are limits upon the principle of amending pleadings through implied consent. *Id*. at 36. For example, a party is entitled to some form of notice that an issue that was not pleaded is before the court. *Id*. Notice can be overt, as where the unpleaded issue is expressly raised prior to or sometime during the trial but before the close of the evidence, or implied, as where the evidence presented at trial is such that a reasonably competent attorney would have recognized that the unpleaded issue was being litigated. *Id*.

[33] We begin our analysis by noting that the Second Amended CHINS petition focused on claims that Child was a CHINS due to neglect pursuant to Indiana Code section 31-34-1-1, and one of the material allegations cited indicated that Child had succumbed to physical abuse in Father's care. Specifically, DCS alleged that "On or about September 12, 2018, [Child] became injured while she was in [Father's] care, custody, and control." (Appellant's App. Vol. II, p. 60). That allegation put Father on notice that DCS intended to present evidence that Child had been physically harmed in his care and that it would be an issue at the factfinding hearing.

[34] Additionally, at the initial hearing on September 21, 2018, DCS presented evidence that it had received three reports relating to Father's physical abuse of Child. DCS claimed that Child had reported that Father had "grabbed [her] by the hair," swung her "around on the floor" and "hit her in the head." (Tr. Vol. II, p. 7). DCS added that on September 12, 2018, Father "struck" Child on her thigh causing her to have a bruise. (Tr. Vol. II, p. 7). DCS also presented pictures of Child's bruise. DCS further stated that Child had "reported being afraid to go back home due to physical . . . abuse in the home" and that she was having "ideations [] of self-harm." (Tr. Vol. II, p. 7).

[35] Moreover, the transcript reveals a plethora of evidence elicited without objection at the factfinding hearing that Father had notice that evidence relating to physical abuse to Child would be presented at the factfinding hearing. Child explicitly testified regarding the incident where Father grabbed her hair, dragged her on the floor, and "hit her head about seven or eight times." (Tr. Vol. II, p. 71). Child claimed that Father's last blow in the head was "really hard" and she "kind of blacked out a little bit." (Tr. Vol. II, p. 71). Child also recapped the incident where Father struck her on her thigh on September 12, 2018. Child testified that Father was "trying to hit me with the belt and kind of open fisted me and hit me in my thigh." (Tr. Vol. II, p. 85).

[36] The purpose behind Trial Rule 15(B) is to provide the parties with some flexibility in litigating a case, and to promote justice by permitting evidence brought in at trial to determine the liability of the parties. *In re V.C.,* 867 N.E.2d 167, 169 (Ind. Ct. App. 2007). In sum, evidence was admitted, without

objection, showing that Child had been injured in Father's care. Moreover, even though the CHINS petition did not cite the appropriate statute relating to abuse, one of the allegations in the Second Amended CHINS petition put Father on notice that evidence involving abuse would be presented by DCS at the factfinding hearing. Thus, Father cannot show that the trial court abused its discretion by permitting DCS to amend the CHINS petition so that it could conform to the evidence. Accordingly, we hold that there was no abuse of discretion.

### IV. *CHINS Adjudication.*

[37] Lastly, Father contends that the evidence is insufficient to support the trial court's CHINS adjudication. DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. *In re Des.B.,* 2 N.E.3d 828, 835-36 (Ind. Ct. App. 2014). In reviewing a CHINS determination, our court does not reweigh evidence or assess witness credibility. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences derived therefrom. *Id.*

[38] In addition, the trial court entered limited findings of fact and conclusions thereon *sua sponte*; thus, our review is governed by Indiana Trial Rule 52(A). The CHINS statute does not stipulate that formal findings must accompany a CHINS determination. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Accordingly, for the issues covered by the court's findings, we apply our two-tiered standard of review, first considering whether the evidence supports the factual findings and then whether those findings support the trial court's

judgment. *Id*. We will not set aside the findings or judgment unless they are clearly erroneous. *In re Des.B.*, 2 N.E.3d at 836. Factual findings are clearly erroneous where there are no facts in the record to support them either directly or by inference. *Id*. "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id*. We accord substantial deference to the trial court's findings of fact but not to its conclusions of law. *Id*. Any issues not covered by the trial court's findings are reviewed under the general judgment standard, "under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d at 1287 (internal quotation marks omitted).

[39]  Here, the trial court concluded that Child is a CHINS "as defined by I.C.31-34-1-1 and 31-34-1-2." (Appellant's App. Vol. II, p. 97). To meet its burden of establishing CHINS status pursuant to Indiana Code Section 31-34-1-1, DCS must prove that Child is under eighteen and that

> (1) Child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of Child's parent, guardian, or custodian to supply Child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) Child needs care, treatment, or rehabilitation that:
>
> (A) Child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[40] To meet its burden of proving CHINS status pursuant to Indiana Code Section 31-34-1-2, DCS must prove that Child is under eighteen and that

> (1) Child's physical or mental health is seriously endangered due to injury by the act or omission of Child's parent, guardian, or custodian; and

> (2) Child needs care, treatment, or rehabilitation that:

> (A) Child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

> (b) Evidence that the illegal manufacture of a drug or controlled substance is occurring on property where a child resides creates a rebuttable presumption that Child's physical or mental health is seriously endangered.

[41] Father specifically challenges the following findings:

> D.  [Child] and [Father] do not have a good relationship and the two get into arguments and yell at one another.  From the testimony of [Child], the [c]ourt finds that Child has a difficult time expressing her feelings to [] [F]ather.  She tries not to anger [] [F]ather and is scared when he becomes angry.  [Father] has put his hands on [Child] when he has become angry with her.

> E.  In May of 2018, [Child] was making breakfast in the kitchen.  She then left the home in order to get syrup from her grandmother's house, however, no one was at her grandmother's home when she got there, so she returned home.  When she returned to her home, [Father] asked her where she had been and

hit her in the head approximately 7-8 times and pulled her hair. [C]hild believes that she may have blacked out for a few seconds after being struck in the head. Her [stepmother], brother and the step-mother's grandmother were at home at the time that this incident occurred, however, no-one acted to protect her.

Between May of 2018 and August 22, 2018, [Child] and [] [F]ather had disagreements about [Child] going to see her boyfriend. [Father] does not like [Child]'s boyfriend and the two would get into arguments about her boyfriend and other issues about every other week. During their arguments, [Father] would call Child names and/or belittle her including calling [Child] her mother's name and making disparaging remarks about [Child's] mother. This behavior hurt [C]hild greatly and was emotionally harmful to her.

On September 12, 2018, [C]hild did not go to school because she had a stomach ache. She also had a doctor's appointment that day and [Father] transported her to the appointment. On the way to the appointment, [C]hild asked [] [F]ather if she could go on a hayride with her sister and two (2) nephews at the pumpkin patch. [] Father then yelled at her and said that she never wanted to do things with him and expressed concern that she was not home much. They went to the appointment and when the appointment was over, they returned to the car and were returning home when the argument resumed. As they were driving home, [] [F]ather lunged at [C]hild. Passers-by witnessed the events and called the police. When the car stopped, [C]hild attempted to get out of the car, however, [] [F]ather threatened to beat her, so she remained in the car. The police arrived and interviewed her and then took her to school. After she arrived at school that day, she went into the girl's restroom because she was upset about what had happened in the car with [] [F]ather. She then went into Mrs. Price's office and informed her about what had happened between herself and [] [F]ather that day. A school nurse took photographs of a bruise on her thigh that she

sustained from an argument that occurred with [] Father one (1) week prior. Ultimately, the Dean of Students called the police officer back and also called the DCS who came to the school and interviewed [C]hild. She was then taken to Youth Services Center by the Department of Child Services case manager.

\* \* \* \*

P. [Child] is sixteen (16) years old. She and [] [Father], have a dysfunctional relationship which has resulted in physical violence being perpetrated upon [Child] by [] [Father]. [] [F]ather has also belittled [] [C]hild and made disparaging remarks to her which has been harmful for her mental and emotional well-being. [Father] lacks appropriate parenting skills and has difficulty managing his anger. As a result, the [C]hild does not feel safe around him and does not wish to return to his home. Accordingly, the [c]ourt finds that [] [C]hild's physical or mental condition is seriously endangered or seriously impaired as a result of [] [Father]'s inability to provide her with necessary food, clothing, shelter, medical care, education, or supervision;

[] [Child], and [] [F]ather are in need of counseling and other services to assist them in repairing their damaged relationship and to teach the two how to interact appropriately with one another. Additionally, [Father] is in need of services to assist him in dealing with his anger and hostility towards his daughter and others and to assist him in learning how to appropriately parent his child. He has been resistant to participating in services in this case and had been resistant to services in the prior CHINS case involving his son, [S.Y.]. He has demonstrated that he will not willingly participate in services designed to assist him in providing the [C]hild with the necessary food, clothing, shelter, medical care, education or supervision without the coercive intervention of the [c]ourt.

Q. In September of 2018, [] [C]hild received physical injuries in the form of a bruised thigh as a result of [Father]'s use of physical violence and/or inappropriate discipline. In May of 2018, [Father] struck Child in the head 7 or 8 times because he was angry with her and/or as a means of discipline resulting in Child "blacking out" for a few seconds. There are significant concerns about [Father]'s history and propensity for engaging in physical violence, his inability to control his anger and his parenting skills. The [c]ourt concludes, by a preponderance of the evidence, that the [C]hild's physical or mental health is seriously endangered due to injury by the act or omission of Child's parent, guardian, or custodian.

(Appellant's App. Vol. II, pp. 91-97).

[42] DCS maintains that the evidence supports the findings, and that the conclusions support the judgment, and Father's challenges to the findings and conclusions are a request to reweigh the evidence. We agree. For instance, Father claims that a "bruise which occurred approximately September 5, 2019, is not likely to be visible more than two weeks later." (Appellant's Br. p. 34). At the factfinding hearing, Child unequivocally testified that Father struck her on her thigh on September 12, 2018, causing her to bruise. When FCM Medina questioned Child on September 19, 2018, seven days after the alleged incident, FCM Medina observed the "bruise to be [greenish-yellow] in color[,] and was large and round." (Appellant's App. Vol. II, pp. 25-26). Pictures relating to Child's bruise were admitted into evidence. Thus, Father's argument is contrary to the evidence and is a request to reweigh the evidence.

[43] Father then downplays the emotional impact his name calling had on Child. During her initial contact with FCM Medina, Child stated that Father would call her a "cunt and bitch." (Appellant's App. Vol. II, p. 27). At the factfinding hearing, Child testified that Mother was a drug addict and when Father compared her to Mother as a way to demean her, it "broke [her] heart." (Tr. Vol. II, p. 73). Child additionally testified that whenever she argued with Father, Father would call her names. Father's favorite name to call Child was "ignorant." (Tr. Vol. II, p. 73). Child testified that Father's name calling was hurtful. Further, Child testified that since she moved out of Father's and Stepmother's home in September 2018, she has never been happier. She stated that her "anxiety has lessened," she was no longer depressed, she had gotten a job, and was saving up money to buy herself a car. (Tr. Vol. II, p. 83). Contrary to Father's claim, his disparaging remarks to Child were harmful to her mental and emotional well-being.

[44] The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect Child. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Father's acts and omissions not only caused physical injury to Child, they were also harmful to Child's mental and emotional well-being, and Father's acts and omissions placed Child in a situation where DCS had to intervene. Based on the foregoing, we conclude that the trial court's

determination that Child was a CHINS under Indiana Code sections 31-34-1-1 and -2, was supported by sufficient evidence.

## CONCLUSION

[45] Based on the foregoing, we conclude that the trial court's failure to complete the factfinding hearing on DCS's CHINS petition within the statutory timeframe did not constitute error; Father waived his right to challenge the untimely completion of the dispositional hearing; the trial court did not abuse its discretion by permitting DCS to amend the CHINS petition so that it could conform to the evidence; and the evidence was sufficient to support the trial court's CHINS adjudication.

[46] Affirmed.

[47] Baker, J. and Brown, J. concur