

FILED

Aug 23 2023, 9:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT B.T.

Riley L. Parr
Lebanon, Indiana

ATTORNEY FOR APPELLANT N.T.

Michael C. Price
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: A.T., Child in Need of Services:

B.T. (Mother) and N.T. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 23, 2023

Court of Appeals Case No.
22A-JC-3051

Appeal from the Boone Circuit Court

The Honorable Lori N. Schein, Judge
The Honorable Sally E. Berish, Magistrate

Trial Court Cause No.
06C01-2110-JC-316

**Opinion by Judge Bradford**
Judges Riley and Weissmann concur.

**Bradford, Judge.**

## Case Summary

[1] B.T. ("Mother") and N.T. ("Father") (collectively, "Parents") are the adoptive parents of A.T. Since being adopted by Parents in 2015, A.T. has engaged in problematic and sometimes violent behaviors. Parents have worked with various service providers over the years to provide A.T. with effective treatment and care. At some point, the Indiana Department of Child Services ("DCS") became involved with the family, providing them with wrap-around services as needed. On October 4, 2021, Parents and A.T. appeared at DCS, with Parents claiming that A.T.'s condition had worsened and that she required residential placement for treatment. A.T. also indicated that she did not feel safe in Parents' home at that time. Two days later, on October 6, 2021, DCS filed a petition alleging that A.T. was a child in need of services ("CHINS"). The juvenile court subsequently found A.T. to be a CHINS. Parents appeal part of the juvenile court's CHINS determination. Concluding that the juvenile court correctly adjudicated A.T. to be a CHINS but that the portion of the juvenile court's order relating to Indiana Code sections 31-34-1-1 and -2 is not supported by the evidence, we affirm in part and reverse in part.

## Facts and Procedural History

[2] Parents are the adoptive parents of A.T., who was born on June 5, 2006. Prior to her adoption by Parents, A.T. "had been a victim of physical abuse and neglect by her biological parent, including witnessing sexually abusive behaviors by her" biological mother. Appellant B.T.'s App. Vol. II p. 8.

Parents met A.T. when she was placed at Coyote Hill Christian Children's Home as a ward of the State of Missouri. While placed at Coyote Hill, A.T. had "struggled with behavioral issues including sexually acting out on others, excessive self-masturbation, property destruction, bullying children at school, extreme attention-seeking, and excessive lying including false allegations of prior sexual abuse by biological father with brother's knowledge of it happening." Appellant B.T.'s App. Vol. II p. 8. She had been diagnosed with post-traumatic stress disorder, oppositional defiant disorder, attention deficit hyperactivity disorder, anxiety disorder, and reactive attachment disorder and had been prescribed various medications.

[3] Despite being aware of A.T.'s mental-health and behavioral issues, Parents adopted A.T. and her brother in 2015. A.T. has, at times, demonstrated problematic and violent behavior since her adoption by Parents and has, at times, received both inpatient and out-patient treatment for her mental-health diagnoses. In 2016, after consultation with A.T.'s then-support team, Parents took A.T. off of her prescribed medications, and A.T. experienced a period of stability. However, by 2019, A.T.'s condition had deteriorated such that her then-support team had recommended that she again be medicated. Additionally, at some point, A.T. "began to report seeing an entity named Samuel with her at times," producing "letters she claimed were from Samuel, drafted in her own handwriting." Appellant B.T.'s App. Vol. II p. 11.

[4] A.T. "was admitted to two acute emergency psychiatric stays during" August of 2020. Appellant B.T.'s App. Vol. II p. 12. Beginning in September of 2020,

A.T. received residential treatment from Resource for "nine and a half (9½) months." Appellant B.T.'s App. Vol. II p. 12. While at Resource, A.T. displayed "dangerous self-harming behaviors, aggression toward peers, [and would] inappropriately manipulate situations and cross boundaries to get her way. She sexually acted out with peers, displayed suicidal ideation, threatened to kill her therapist and attempted to physically harm [her] therapist." Appellant B.T.'s App. Vol. II p. 12. A.T. was discharged from Resource on July 19, 2021, without successfully completing her programming "due to Medicaid terminating funding for the private placement." Appellant B.T.'s App. Vol. II p. 13. Following A.T.'s discharge from Resource, the family was referred to DCS for community wrap-around services. In the months that followed, A.T. continued to engage in problematic, sometimes violent behavior.

[5]    On October 4, 2021, following another incident involving A.T., Parents brought her to their local DCS office. Parents reported that A.T. had threatened to kill her adult sibling and had threatened to harm them. Parents indicated that they wanted A.T. "to go to a facility" and A.T. indicated that she did "not feel safe in [Parents'] home." Appellant B.T.'s App. Vol. II p. 57. As of October 4, 2021, A.T. had been diagnosed with "Reactive Attachment Disorder, Dysregulated Mood Disorder, ODD, ADHD, and Anxiety. [A.T. was] on medications and participating in wrap around services through DCS." Appellant B.T.'s App. Vol. II p. 57.

[6]    While at the DCS office, Parents met with DCS representatives who were a part of A.T.'s family-care team, with whom they eventually agreed to a safety plan

that would have A.T. transported to a hospital for a risk assessment, with Parents following behind in a separate vehicle. However, after the members of A.T.'s family-care team left the DCS offices, a DCS supervisor, who was not a part of A.T.'s family-care team, "overrode the **agreed on** safety plan and instead had the [family-case managers] advise Parents they had to agree to take Child home with them or DCS would charge them with abandonment." Appellant B.T.'s App. Vol. II pp. 16–17 (emphasis in original, internal quotation omitted).

[7] DCS removed A.T. from Parents' home and, two days later, on October 6, 2021, filed a petition alleging that A.T. is a CHINS pursuant to Indiana Code section 31-34-1-1. A.T. was initially placed in two different foster homes, before being placed in "residential placement at Oaklawn Psychiatric Center." Appellant B.T.'s App. Vol. II p. 17. A.T.'s placement in each of the foster homes failed due to A.T.'s "verbal and physical aggression and violent physical behavior" as, in both homes, A.T. "threatened physical harm or to kill foster placement's family members and laid hands on foster placement or foster placement's family members in anger." Appellant B.T.'s App. Vol. II p. 17. A.T. also engaged in

> multiple incidents of self-harming behavior, including attempted cutting, punching objects causing serious injury to her hand, refusing to take medication, attempting to drink chemicals, placing pop-tops and other objects in her mouth, taking an entire bottle of medication at one time (then spitting it out – but without the ability for placement to do a proper pill count to know if [A.T.] did in fact swallow any pills).

Appellant B.T.'s App. Vol. II p. 17. A.T.'s concerning behaviors, including physical aggression toward others, self-harm, and suicidal ideation have continued since her placement at Oaklawn. Since A.T.'s placement at Oaklawn, A.T. has engaged in family counseling, as have Parents, with the therapeutic recommendation since A.T.'s admission being that there be no in-person visitation between Parents and A.T. but with cards passed through the therapist.

[8] As the case proceeded, Parents separately requested permission to offer evidence establishing that A.T. was a CHINS pursuant to Indiana Code section 31-34-1-6. The matter eventually proceeded to a five-day evidentiary hearing, beginning on March 3, 2022, and continuing on June 1 and 2, 2022; July 27, 2022; and August 17, 2022. On July 26, 2022, after the first three days of the evidentiary hearing had been completed and after DCS had completed its case-in-chief, DCS requested permission to amend its initial CHINS petition to include an allegation that A.T. was also a CHINS pursuant to Indiana Code section 31-34-1-2. Parents objected to DCS's request to amend the CHINS petition, arguing that the amended petition was untimely and that "permitting an amendment at this stage undermines all concept of notice and due process rights." Appellant B.T.'s App. Vol. II p. 143. The juvenile court granted DCS's request over Parents' objection and the proceedings continued.

[9] On October 31, 2022, the juvenile court issued an order in which it found A.T. to be a CHINS, concluding that the evidence demonstrated that A.T. is a

CHINS under Indiana Code sections 31-34-1-1, -2, and -6.  With regard to

Indiana Code section 31-34-1-1, the juvenile court concluded as follows:

> DCS has proven by a preponderance of the evidence that [A.T.]
> is a [CHINS] as defined by [Indiana Code section] 31-34-1-1 in
> that her physical and mental condition is seriously impaired and
> seriously endangered as a result of the inability and refusal of the
> Parents to supply her with the necessary shelter, supervision, and
> medical care.
>
> Parents appeared at DCS on October 4, 2021[,] with no other
> intention than leaving without Child in their care and custody.
> They claimed to be afraid of her violence; but routinely disregard
> her behaviors as attention seeking only.  They refused to [agree to
> as part of a] reasonabl[e] safety plan for her return home.  They
> refused to provide alternative placement options for her, claiming
> she had burned all her bridges.  Parents were intent on Child
> being placed only in residential treatment that day and Mother
> unequivocally stated on the last day of trial that Parents stance
> on Child's continued placement <u>only in long term residential
> treatment</u> and <u>not in their home</u> has not changed.
>
> Further, Parents have established a pattern of ignoring
> professional medical Orders for Child's care by removing Child
> from prescribed medications and ignoring counseling treatment
> plans.  Parents made repeated decisions against medical advice
> for Child.  Parents have refused to acknowledge Child's
> increasingly dangerous behaviors and instead believe her
> behaviors are attention seeking and nothing more.
>
> The coercive intervention of the Court is necessary because on
> October 4, 2021[,] Parents refused to provide Child with the
> necessary shelter and supervision which seriously impaired and
> endangered her well-being and their stance on taking her back
> into their home has not changed.  In addition, they have
> established a pattern of refusing to provide her with the necessary

medical care and treatment prescribed by multiple physicians and mental health professionals, which has seriously impaired and endangered her well-being.

Appellant B.T.'s App. Vol. II pp. 19–20 (underlining in original). With regard to Indiana Code section 31-34-1-2, the juvenile court concluded as follows:

DCS has proven by a preponderance of the evidence that [A.T.] is a [CHINS] as defined by [Indiana Code section] 31-34-1-2 in that during 2016–2018[,] Parents willfully chose to ignore or disregard multiple medical Orders of Child's physicians and mental health professionals regarding her medications and mental health treatment plans.

In addition, during those years and years after, Parents chose to disregard the recommendations of educational specialists regarding Child's Educational Disability in her best interest, which recommended home schooling or online school. Parents unilaterality acted in their own best interest and enrolled her in public school.

During this period, Child reported seeing a hallucination or celestial being, Samuel. Child reports Samuel guides her actions and affects her moods. Parents disregarded this as simply further attention seeking behavior, thus seriously endangering Child's mental health.

Also, during this period, Child's behaviors in the home and at school increased in intensity, violence and frequency and grew to include suicidal ideation. Parents again disregarded these behaviors as attention seeking and seriously endangered Child's mental health.

The coercive intervention of the Court is necessary because Parents['] acts or omissions in withholding Child's medication and therapy more likely than not lead to the increase in

frequency and intensity of Child's negative and dangerous behaviors. Parents established a pattern of acting in their own best interest in making these decisions, not in Child's best interest. Mother in fact testified to the very same. Without the coercive intervention of the Court on behalf of Child, Parents are certain to revert to the same decision[-]making process.

Appellant B.T.'s App. Vol. II p. 21. With regard to Indiana Code section 31-34-1-6, the juvenile court concluded as follows:

[Parents have[1]] proven by a preponderance of the evidence that [A.T.] is a [CHINS] as defined by [Indiana Code section] 31-34-1-6 in that Child has exhibited self-harming behavior both in the home and at school and those behaviors have steadily increased in intensity and danger.

Child has substantially endangered her own health (taking an entire bottle of pills) or the health of another (threatening to take weapons to school, threatening to kill a teacher or children in their sleep, threatening to kill Mother and brother). These behaviors have happened in the home, in and out of multiple relative foster and residential placements and continue to do so while in the current DCS residential placement. She sees a hallucinated being. She is violent toward others. She threatens to harm and kill others. She has physically harmed others.

The coercive intervention of the Court is necessary because Parents have failed to take Child's behaviors seriously and failed to protect the Child, themselves and others *from Child*. The coercive intervention of the Court is necessary because Child is

---

[1] The juvenile court's original order indicated that DCS had proven that A.T. was a CHINS pursuant to Indiana Code section 31-34-1-6, but the court subsequently issued a nunc pro tunc order, correcting its conclusion to state that Parents had proven that A.T. was a CHINS pursuant to Indiana Code section 31-34-1-6.

unable to protect *herself*.

> DCS has misinterpreted the statute in their argument against a Finding under IC 31-34-1-6. The statute does not require Child to present a danger only to Parents, and the argument that she is not a danger because of her current placement is not well founded. First, the statute requires endangerment of "another individual", not endangerment to the parent. Child is clearly continuing to present a danger to other individuals while she [is] in residential placement. Secondly, perhaps that danger is indeed mitigated because of her placement and intensive level of supervision; however, that does not mean she is not a substantial danger. It simply means due to Court intervention an appropriate placement has been found to address her needs.

Appellant B.T.'s App. Vol. II pp. 22–23 (emphases in original). Given these conclusions, the juvenile court ordered that A.T. "shall remain in her current home or placement, with supervision by DCS" and that the family should continue to engage in family therapy. Appellant B.T.'s App. Vol. II p. 26.

## Discussion and Decision

[10]     At the outset, we note that in adjudicating A.T. to be a CHINS, the juvenile court concluded that A.T. was a CHINS under multiple sections of the Indiana Code, including Indiana Code section 31-34-1-6. Indiana Code section 31-34-1-6 provides that in order to adjudicate a child to be a CHINS under that section, it must be proven by a preponderance of the evidence that

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

> (1) the child substantially endangers the child's own health or the health of another individual; and
> (2) the child needs care, treatment, or rehabilitation that:
>> (A) the child is not receiving; and
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Parents do not challenge the juvenile court's conclusion that A.T. is a CHINS pursuant to Indiana Code section 31-34-1-6 on appeal. As such, regardless of the success of Parents' arguments on appeal, the portion of the juvenile court's order adjudicating A.T. to be a CHINS under Indiana Code section 31-34-1-6 will remain intact.

[11] However, Parents' challenges to the juvenile court's order are not moot given the harmful collateral consequences that may be suffered by a parent following a CHINS determination. For instance, a CHINS determination, especially one indicating that a parent had neglected or abandoned a child, could result in adverse job consequences or preclude a parent from serving as a foster parent in the future. *See In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014) (providing that a CHINS determination could result in adverse job consequences or preclude a parent from serving as a foster parent). As such we will address Parents' appellate challenges to the juvenile court's order.

# I.   Parents' Challenges to the Juvenile Court's Order

[12] Parents contend that the juvenile court erred in allowing DCS to amend the CHINS petition to include Indiana Code section 31-34-1-2 after three days of the evidentiary hearing had been completed. They also contend that the evidence is insufficient to sustain the juvenile court's determination that A.T. is a CHINS under Indiana Code sections 31-34-1-1 and -2.

## A.  Amendment to CHINS Petition

[13] Indiana Trial Rule 15(B), which we have previously noted applies to CHINS proceedings, *see Maybaum v. Putnam Cnty. Off. of Fam. & Child.*, 723 N.E.2d 951, 954 (Ind. Ct. App. 2000), provides as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Ind. R. Trial P. 15. In *Maybaum*, we noted that while a CHINS petition "is an integral part of ensuring that the parents have notice of the allegations and an

opportunity to contradict [DCS's] evidence," the purpose of Trial Rule 15(B) "is to promote relief for a party based upon the evidence actually introduced at trial, notwithstanding the allegations set forth in the pleadings." 723 N.E.2d at 954. Furthermore, "[n]otice may be express if raised prior to or during trial, or implied, if the evidence presented at trial places a reasonably competent attorney on notice that the issue was before the court." *Id.* We generally review a trial court's decision to grant or deny an amendment to pleadings for an abuse of discretion. *See Miller v. Patel*, 174 N.E.3d 1061, 1064 (Ind. 2021).

[14] In this case, following the third day of the evidentiary hearing and after DCS had rested its case-in-chief, DCS requested permission to amend the CHINS petition to include Indiana Code section 31-34-1-2, which states that a child may be found to be a CHINS if the "child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent." DCS argues that the evidence that had been presented during its case-in-chief supported a CHINS determination under this statutory section and that the requested amendment would simply allow the pleadings to conform to the evidence. The juvenile court granted DCS's request to amend the CHINS petition over Parents' objections.

[15] On appeal, DCS argues that the juvenile court acted within its discretion in allowing it to amend the CHINS petition, pointing specifically to the fact that the juvenile court offered to grant Parents a continuance so to present them with an opportunity to refute the allegation during their cases-in-chief. We have previously concluded that "[i]f the trial court allows introduction of an

issue not raised before trial, an objecting party may seek a reasonable continuance in order to prepare to litigate the new issue." *In re V.C.*, 867 N.E.2d 167, 178 (Ind. Ct. App. 2007).

In this case, DCS's motion was filed ten minutes before the close of business on the day before the fourth day of the evidentiary hearing. The juvenile court indicated that it would grant Parents a continuance to prepare a defense to the amendment if Parents so wished but counsel for Parents declined, with each indicating that they would proceed with the fourth day of the hearing as scheduled and with Father's counsel indicating that they would "take advantage of the Court's opportunity here to come back on another day for those types of issues." Tr. Vol. IV pp. 37–38. Notably, the fifth day of the evidentiary hearing did not occur until three weeks later, which gave Parents and their counsel the opportunity to craft a defense and attempt to refute the previously-admitted evidence relating to a CHINS finding under Indiana Code section 31-34-1-2. We cannot say that the juvenile court abused its discretion in allowing DCS to amend the CHINS petition, especially given the fact that Parents and their counsel had the opportunity during the three weeks between hearing dates to craft responses to DCS's added allegation.

## B. Sufficiency of the Evidence

The Indiana Supreme Court has noted that when deciding whether a child is a CHINS,

[j]uvenile court judges are often faced with the challenge of balancing multiple factors and multiple voices…. Judges must uphold the due process rights of parents, apply the proper law, and take into account recommendations and input from the court appointed special advocate (CASA), DCS, parents, step-parents, guardians, grandparents, the child, and often several attorneys. By their very nature, these cases do not fit neatly defined guidelines.

*In re K.D.*, 962 N.E.2d 1249, 1255 (Ind. 2012). "A CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d at 1290. Furthermore, the Indiana Supreme Court has held that when the court's coercive intervention is not necessary, "the State may not intrude into a family's life." *Id.*

When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. Instead, we consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. When a trial court supplements a CHINS judgment with findings of fact and conclusions law, we apply a two-tiered standard of review. We consider, first, whether the evidence supports the findings and, second, whether the findings support the judgment. We will reverse a CHINS determination only if it was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts.

*In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 577–78 (Ind. 2017) (cleaned up).

Parents challenge the sufficiency of the evidence to sustain the juvenile court's conclusion that A.T. was a CHINS under Indiana Code sections 31-34-1-1 and -2. Indiana Code section 31-34-1-1 provides that in order to adjudicate a child to be a CHINS under that section, DCS must prove by a preponderance of the evidence that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered *as a result of* the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>> (A) when the parent, guardian, or custodian is financially able to do so; or
>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
> (2) the child needs care, treatment, or rehabilitation that:
>> (A) the child is not receiving; and
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

(Emphasis added). Indiana Code section 31-34-1-2(a) provides that in order to adjudicate a child to be a CHINS under that section, DCS must prove by a preponderance of the evidence that

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>> (1) the child's physical or mental health is seriously endangered *due to injury by the act or omission of the child's parent*, guardian, or custodian; and
>> (2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court.

(Emphasis added).

[20] In challenging the sufficiency of the evidence to sustain the juvenile court's order, Mother argues that the juvenile court erred in finding that A.T. was a CHINS under Indiana Code sections 31-34-1-1 and -2 because there was no evidence demonstrating a connection between Parents' actions and A.T.'s diagnoses and behaviors. For his part, Father argues that the evidence is insufficient to support a CHINS determination under any theory other than Indiana Code section 31-34-1-6 because abandonment never occurred and the challenged reasons for the CHINS adjudication are based on forbidden speculation. We will address Parents' arguments separately.

### 1. Mother's Arguments

[21] Mother argues that numerous factual findings made by the juvenile court are not supported by the evidence. Specifically, she challenges the sufficiency of the evidence to support Finding Numbers ("Finding No.") twenty-one, thirty-three, thirty-five, thirty-seven, fifty-one, fifty-two, fifty-eight, fifty-nine, seventy-two, seventy-seven, and seventy-eight.

### a. Finding No. Twenty-One

[22] Finding No. twenty-one reads: "In February 2016, Mother and Father took Child off all medications because Child, who was nine (9) years old, didn't

want to take them." Appellant B.T.'s App. Vol. II p. 9. On cross-examination, Mother was asked "[w]hose decision was it to stop [A.T.'s] medications in February of Twenty-Sixteen?" Tr. Vol. V p. 40. Mother's response reads as follows:

> It was a team decision. [A.T.] had voiced she didn't want to be on meds because she felt it stigmatized her and so we met with her worker, the state worker, I don't remember her name, but it was a[n] adoptive worker from the State of Miss, Missouri as well as her psychiatrist I mean we had team meetings every week, so teams were involved in all of our decisions throughout this time.

Tr. Vol. V pp. 40–41. Mother further stated that A.T. was nine years old at the time her team decided to stop her medication.

[23] While Finding No. twenty-one is accurate in as far as A.T. had voiced to Parents that she had not wanted take medication because she felt "it stigmatized" her, the finding is inaccurate in so far as it suggests that Parents unilaterally stopped A.T.'s medication because of A.T.'s wishes. Tr. Vol. V. p. 40. The distinction is important given that the juvenile court appears to have relied on Finding No. twenty-one in concluding that "Parents established a pattern of ignoring professional medical [o]rders for [A.T.'s] care by removing [A.T.] from prescribed medications," Parents "have established a established a pattern of refusing to provide her with the necessary medical care and treatment prescribed by multiple physicians and mental health professionals," "Parents willfully chose to ignore or disregard multiple medical [o]rders of [A.T.'s]

physicians and mental health professionals regarding her medications," and "coercive intervention of the Court is necessary because Parents['] acts or omissions in withholding [A.T.'s] medication and therapy more likely than not lead to the increase in frequency and intensity of [A.T.'s] negative and dangerous behaviors." Appellant B.T.'s App. Vol. II pp. 20, 21.

[24] DCS has pointed to no evidence to counter Mother's testimony that the decision to stop A.T.'s medication in 2016 was not a unilateral decision by Parents, but rather was a decision made in consultation with an agreement by A.T.'s then-care team. Thus, to the extent that the juvenile court relies on Finding No. twenty-one to support its conclusion that Parents unilaterally stopped A.T.'s medication in 2016, against the recommendation of A.T.'s doctors and caregivers, the evidence does not support the juvenile court's finding but rather supports the opposite finding, *i.e.*, that Parents had stopped A.T.'s medication in consultation and agreement with her psychiatrist and case worker.[2]

---

[2] Although not specifically challenged by Mother, we note that Finding No. twenty-four is also not supported by the evidence in so far as it indicates that the decision to stop A.T.'s medication in 2016 "was a unilateral decision by Parents, against all professional and medical recommendations at the time[.]" Appellant B.T.'s App. Vol. II p. 10. Again, Mother's testimony, which was not countered by DCS, indicates that the decision to stop A.T.'s medication was a team decision, not a unilateral decision made by Parents, and that the decision was not made "against all professional and medical recommendations." Appellant B.T.'s App. Vol. II p. 10.

### b. *Finding Nos. Thirty-Three, Thirty-Five, Fifty-One, Fifty-Two, and Seventy-Seven*

[25]    Finding No. thirty-three reads: "Parents believe [A.T.'s] suicidal ideations at school were a result of being redirected by the teacher and nothing more." Appellant B.T.'s App. Vol. II p. 11. Finding No. thirty-five reads: "Parents believe [A.T.'s] suicidal ideations were done for shock value and nothing more." Appellant B.T.'s App. Vol. II p. 11. Finding No. fifty-one reads: "Parents believed [A.T.'s] self-harming behaviors were only for attention and not intended for actual harm, as were her suicidal ideations." Appellant B.T.'s App. Vol. II p. 13. Finding No. fifty-two reads: "Parents declined to safety plan regarding knives and sharp objects in the home. Parents refused to remove any barber shop supplies from their home (scissors and knives brother used for his business). They believed it was unnecessary as [A.T.] would only harm herself for attention and nothing more." Appellant B.T.'s App. Vol. II p. 13. Finding No. seventy-seven reads: "Parents declined to safety plan regarding weapons in the home, stating instead [A.T.] should know not to use them." Appellant B.T.'s App. Vol. II p. 16.

[26]    On cross-examination of Mother, DCS inquired into A.T.'s attention-seeking behaviors, with the following exchange occurring:

> [DCS]:     Is it true that [A.T.] has attention seeking behaviors?
> [Mother]:   Yes.
> [DCS]:     Is it true that one of those attention seeking behaviors is to express suicidal ideation?
> [Mother]:   It can manifest that way.
> [DCS]:     Has [A.T.] ever actually attempted suicide?

[Mother]:     [A.T.] has hurt herself many times I don't know if it was an attempt to suicide.  She has reported both yes and no on the same incidents so I-I can't speak to that.

Tr. Vol. V p. 64.  Mother also testified about A.T.'s more than thirty threats to commit suicide in late 2019 and early 2020, with Mother stating that the threats occurred primarily at school, "mostly when she was being told to do something that's kind of what the teachers gave off is that [the threats occurred] mostly when she was being told like in a redirect."  Tr. Vol. IV p. 203.  Mother further testified that they sought treatment for A.T. in response to her threats, describing her two short inpatient stays before she eventually was placed at Resource for nine and one-half months.

[27]  Further, while one of A.T.'s teachers testified that Father had stated that A.T.'s behavior was "attention seeking," he further testified that Father had indicated that he "just wanted to take her to the emergency room or the stress center."  Tr. Vol. II p. 72.  A DCS representative who worked with the family indicated that Mother had indicated that she did not believe that a safety plan was warranted regarding weapons or sharp objects in the home "because they know that [A.T.] would only harm herself for attention."  Tr. Vol. II p. 108.  The record does not support the finding that Parents were asked, much less that they refused, to remove the items from the home but rather the evidence centered on discussions about whether such items should be locked up or put away.

[28]  The evidence supports the juvenile court's findings that Parents believed that A.T.'s behavior was, at least in part, attention-seeking.  To the extent that

Parents assert otherwise, their assertion amounts to a request for this court to reweigh the evidence, which we will not do. *See In re D.J.*, 68 N.E.3d at 577–78. However, to the extent that the juvenile court used these findings to support the conclusions that Parents did not treat A.T.'s threats seriously or did nothing to attempt to provide her with any necessary care or treatment, the juvenile court's conclusions are not supported by these findings as the evidence clearly established that Parents had taken A.T.'s threats seriously enough to seek various forms of treatment for A.T.

### c. Finding No. Thirty-Seven

Finding No. thirty-seven reads: "Parents believe Child's report of seeing Samuel was an attempt at attention[-]seeking and nothing more." Appellant B.T.'s App. Vol. II p. 11. Mother's testimony regarding A.T.'s report of seeing "Samuel" provided as follows:

> So there was this period of time where she began saying when she came back home that she was seeing this entity and that she could summon him and that he was standing behind us and that he was mocking us, or he didn't agree with us, and so she would leave letters from Samuel to herself in her handwriting but she said they were from him if that makes sense. So we would find these letters and she would come and be like no he's real stop telling me he's not real and as I tried to be sensitive to this situation and say I believe that he is real to you but nobody else can see this and there is such a thing as a distortion of reality. So I tried to be very open with her that like, if she was using if for behavioral tendencies that needed to stop and we needed to figure out better ways. Like if she was trying to get something out of it whether that was attention seeking which we-we used a lot she, I said if this is an attention seeking procedure then we

need to stop. If you are actually seeing this we need psychiatric help, so we obviously had Aspire so we started talking with her therapist and her psychiatric, she had a med specialist actually it was … that actually started suggesting we put her back on meds and we said trialing this and so by the time we got back to Zionsville they said they really saw a need for medication and so we did go ahead and reintroduce a physiatrist and a medication specialist to be on her team when she came to Zionsville.

Tr. Vol. IV pp. 199–200. Mother's testimony does not indicate that Parents believed that A.T.'s reports of seeing "Samuel" were nothing more than attention-seeking. DCS does not point to any additional evidence, but merely argues that the juvenile court could reasonably infer from the evidence that Parents believed that A.T.'s report were "attention[-]seeking and nothing more." Appellant B.T.'s App. Vol. II p. 11. We disagree. The evidence does not support the juvenile court's finding that Parents discounted A.T.'s report as attention seeking and nothing more. As such, to the extent that the juvenile court relied on this finding to support its conclusion that Parents failed to treat A.T.'s mental-health issues seriously, such conclusion cannot be supported by this unsupported finding.

### d. Finding Nos. Fifty-Eight and Fifty-Nine

[30] Finding No. fifty-eight reads: "Ms. Green[3] observed [A.T.] to be a thoughtful kind person and had no inappropriate interactions with her. [A.T.] worked

---

[3] Katherine Green is a self-employed habilitation provider who met with A.T. when she "interviewed to become the Habilitation Provider and possibly to provide service[s]" for the family. Tr. Vol. II p. 202.

toward her goals of impulse control, respecting relationships with others and appropriate interactions." Appellant B.T.'s App. Vol. II p. 14. Finding No. fifty-nine reads: "Ms. Green observed the interactions between Parents and [A.T.] to be stressful, negative and frustrating. Parents told [A.T.] 'If you don't start to act better, we are going to give you up.'" Appellant B.T.'s App. Vol. II p. 14. Citing to *Pitcavage v. Pitcavage*, 11 N.E.3d 547, 553 (Ind. Ct. App. 2014), Mother argues that these findings are "inappropriate" because they merely recite a witness's testimony. Appellant B.T.'s Br. p. 29. For its part, DCS asserts that the findings indicate that the juvenile court's findings represent the court's summary of Green's testimony, which it claims the juvenile court found to be credible. We agree with DCS on this point. The juvenile court's findings regarding Green's testimony are an accurate summation of Green's overall testimony.

*e.      Finding Nos. Seventy-Two and Seventy-Eight*

[31]    Finding No. seventy-two reads:

> October 3, 2021[,] [Family Case Manager ("FCM")] Shelia Crossley held a safety planning meeting with Parents and [A.T.]. Parents were adamant [A.T.] could not return to the home as they were fearful of her. The safety plan was written for [A.T.] to remain with the family friend pending a Child and Family Team Meeting (CFTM) to be held at the Boone County DCS Office on October 4, 2021.

Appellant B.T.'s App. Vol. II p. 15. Finding No. seventy-eight reads: "Parents did not believe [A.T.] was a harm to herself or others, as they believe her

actions and behaviors are all attention seeking." Appellant B.T.'s App. Vol. II p. 16. In challenging these findings, Mother asserts

> Findings #72 and #78 are unsupported by the evidence, and in any event are internally inconsistent. Parents self-evidently believed that A.T. was a danger, at least to others, as Mother's testimony recounted countless examples of A.T.'s explosive behaviors. Moreover, it is counterintuitive that parents would be afraid of A.T. and yet also believe that all of her behaviors were to garner attention. These findings are also inconsistent with Parents' repeated request—that went unheeded by DCS until A.T. physically assaulted a foster parent—that A.T. be admitted to a residential facility because of her behaviors.

Appellant B.T.'s Br. p. 29. DCS does not respond to Mother's arguments regarding these findings. We agree with Mother that the findings are inconsistent, and that Finding No. seventy-eight is unsupported by the record as the evidence overwhelmingly demonstrated that Parents feared A.T. and believed that she was a threat to both herself and others. As for Finding No. seventy-two, the record reveals that following an episode in the family home, FCM Crossley had discussed a temporary safety plan with the family that included A.T. spending the night at a family friend's home until a CFTM meeting could be held the next day. As such, Finding No. seventy-two is supported by the evidence.

### f. *Mother's Additional Arguments*

[32] Mother argues that "[s]tripping away the findings that lack any factual basis in the record, the [juvenile] court's decision finding a CHINS-1 and -2 is

inappropriate because none of the findings nor conclusions explain *how* the parents' purported actions or omissions caused A.T.'s diagnoses" and the juvenile court's decision "stretches the CHINS statute too far and delves into connecting dots that do not exist." Appellant B.T.'s Br. p. 29 (emphasis in original). Mother further argues that DCS did not present any evidence to suggest that "*had* parents followed all treatment recommendations to a "T" that A.T. would not be in the same position today." Appellant B.T.'s Br. pp. 29–30 (emphasis in original). "Said another way, no evidence was presented that Parents *caused*, whether by act or omission, A.T.'s present status." Appellant B.T.'s Br. p. 30 (emphasis in original). Mother correctly asserts that the juvenile court's own findings indicated that A.T.'s behavior did not significantly change during periods when she was medicated versus unmedicated or receiving versus not receiving mental-health treatment.

[33] Mother also argues that the juvenile court's determination that Parents abandoned A.T. is not supported by the evidence. We have previously concluded that "abandonment exists when there is such conduct on the part of a parent which evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Adoption of M.L.L.*, 810 N.E.2d 1088, 1092 (Ind. Ct. App. 2004) (internal quotation omitted). Mother asserts that Parents did not abandon A.T. but rather that "DCS foisted a Hobson's choice upon Parents: Take A.T. back with them to a likely unsafe environment … or accept a substantiation." Appellant B.T.'s Br. pp. 32–33. Mother further asserts that

> [i]f Parents intended on October 4, 2021[,] to abandon A.T., it was exceptionally poorly executed. The uncontroverted testimony was that Parents participated in wrap-around services after removal even after DCS sought to discontinue wrap-around, Tr. Vol. III, pp. 195–99, and then participated in family therapy through Oaklawn. *Id.* at 241–42.

Appellant B.T.'s Br. p. 33. We agree with Mother that the record does not support the juvenile court's conclusion that Parents abandoned A.T.

### 2. *Father's Arguments*

### a. *Abandonment*

[34] Father challenges the juvenile court's determination that Parents abandoned A.T., arguing that A.T. "was never abandoned by [Parents], period. Parents were thrust into in an extreme set of circumstances regarding how and under what conditions it would be literally, physically safe to keep [A.T.] in their home, in the first week of October of 2021," after A.T. had threatened Mother and her brother. Appellant N.T.'s Br. p. 23. Father further argues that

> It is at this critical point that DCS itself destroyed its own abandonment allegation. Rather than follow through with the plan, DCS waited for [Parents'] Wrap Around supports to leave, then dismissed the attending police officer, and demanded, threatened, and coerced [Parents] to take Child immediately, or face "charges" of neglect and abandonment. [Parents] never had the opportunity to follow through on the hospital plan, to confer with hospital staff, to continue discussions with the Wrap Around supports that had worked with them since July of 2021 to try to maintain [A.T.] in the face of DCS'[s] own efforts to prevent the residential placement parents were requesting help in obtaining, which itself had already been successful in

maintaining parent-approved shelter for Child for the two previous nights (October 2 and 3). Due to DCS'[s] unilateral disruption of [Parents'] crisis management plan, no one knows if any of a multitude of other events might have taken place…. By asserting [Parents] abandoned [A.T.], DCS whistles past the fact that [Parents] never actually refused to take [A.T.] home had the plan not been interrupted by DCS, and is merely speculating that [Parents] would have not taken her home, as well as speculating that the hospital would have released her in the first place.

Appellant N.T.'s Br. p. 24. Father asserts that "[a]bandonment never happened, abandonment was not proven or supported by sufficient evidence[.]" Appellant N.T.'s Br. p. 25. As we concluded above, we must agree. The record clearly demonstrates, and even the juvenile court's factual findings recognize, that Parents went to DCS on October 4, 2021, seeking help in acquiring what they believed, and what DCS ultimately determined, was appropriate care for A.T. Parents have demonstrated a pattern of providing for A.T.'s needs, including seeking outside assistance when necessary. Since A.T. has been removed from their care, Parents have actively participated in therapy in a manner consistent with the recommendations of A.T.'s therapist. Thus, to the extent that the juvenile court's CHINS determination relating to Indiana Code section 31-34-1-1 is based on a determination that Parents had abandoned A.T., such a determination is not supported by the record.

### b. *Evidentiary Challenges*

Father also argues that the "[e]vidence is insufficient to sustain CHINS theory other than CHINS-6," claiming that many of the juvenile court's factual

findings regarding the need for A.T. to be placed in residential treatment are inconsistent or "trap" parents. Appellant N.T.'s Br. p. 29. Father points out that some of the juvenile court's findings, including Findings Nos. nineteen, twenty-four, twenty-seven, and fifty, and conclusory paragraphs two and four are inconsistent as they both paint a picture that Parents did not do enough for A.T. but also somehow indicated that their act of advocating for the need for residential placement amounted to neglect and abandonment. For instance, Finding No. nineteen states that following A.T.'s second emergent stay, service providers recommended that Parents "pursue residential treatment for" A.T. but Finding No. fifty criticizes Parents for being "adamant" that residential treatment was the "only service that was appropriate for" A.T. Appellant B.T.'s App. Vol. II pp. 9, 13. Finding No. twenty-seven indicates that in 2018, a service provider suggested that residential treatment was "an appropriate option for" A.T., but that Parents opted to try a different treatment plan rather than seeking residential placement at that time. Appellant B.T.'s App. Vol. II p. 10. Father asserts that

> Again, it must be asked, are Parents to be blamed for trying to put [A.T.] in residential placement, or for keeping [A.T.] out of residential placement? In the [juvenile] court's findings, they are blamed for both, most egregiously at the precise moment when DCS decided to open a case specifically because they knew residential placement was critical, which has obviously played out in real time since the case opened, as exactly correct.

Appellant N.T.'s Br. p. 31.

[36] Finding No. twenty-four indicated that the decision to remove A.T. from medication was a "unilateral decision by Parents, against all professional and medical recommendations at the time, which they feel is justified because it is what Child wanted as well and Child thought talking to Mother was as good as a counselor." Appellant B.T.'s App. Vol. II p. 10. As we mentioned above in Footnote 2, the juvenile court's determination that the decision to stop A.T.'s medication was a unilateral decision made by Parents is not supported by the record. Father asserts that "[t]here is copious evidence that participation with [A.T.] in medication, therapy, and counseling, has no cause and effect relationship to [A.T.'s] behaviors escalating or de-escalating."[4] Appellant N.T.'s Br. p. 30. In support, Father points to the juvenile court's other factual findings which outlined the various treatment options and placements sought and agreed to by Parents over the course of A.T.'s life.

[37] Father also challenges the juvenile court's findings relating to A.T.'s education, stating that

> Findings in paragraphs 28, 29, 30, and 32 suggest [Parents] are at fault for not following recommendations for [A.T.] to be home-schooled or in online schooling. Findings in paragraphs 63 and 64, then suggest [Parents'] requested controls on [A.T.]'s

---

[4] Father claims that DCS's allegation that Parents had neglected A.T. by stopping her medication or changing A.T.'s therapy treatment options in 2016 is countered by evidence indicating that since A.T.'s removal from Parents' home, DCS has not always been consistent with A.T.'s counseling or medication management as it did not initially require A.T. to participate in therapy, counseling, or medication management. As we concluded above, the juvenile court's findings regarding Parents' decision to stop A.T.'s medication in 2016 are insufficient to support the juvenile court's conclusions that Parents neglected A.T. or refused to provide her with necessary medical care.

behaviors at Zionsville Middle School were unnecessary, baseless, and that there were "no behaviors of [A.T.'s] to be out of the ordinary for a child in [teacher's] classroom or any typical intensive intervention student."

Appellant N.T.'s Br. p. 31 (last set of brackets in original). Finding Nos. twenty-eight, twenty-nine, thirty, and thirty-two can be read together as criticism for Parents enrolling A.T. in in-person schooling while Finding Nos. sixty-three and sixty-four can be read together as apparent criticism for Parents being too involved with A.T.'s schooling as the supporting testimony indicated that A.T. was, for a time, responding well to the in-person setting and was behaving as other children in her class. Father further argues that

> In either case, [P]arents are again blamed regardless of which direction they pivot. If [A.T.] is not put in a school facility, they are not following professional recommendations. When they put [A.T.] in a school facility, their parental decisions are found as neglectful or detrimental, even as they are proven to be prescient.

Appellant N.T.'s Br. p. 32.

[38] Father asserts that Parents' "choice of schooling, medical care, and attempts to alleviate and modify [A.T.'s] consistently anti-social and self-harming behaviors through any means, and with professional advice, is a parental choice, one not to be lightly preplaced by DCS'[s] or the [juvenile] court's own hindsight[-]based criticism." Appellant N.T.'s Br. p. 32. Father also takes issue with the juvenile court's conclusion that Parents "chose themselves over" A.T., pointing to the years of prior and continuing efforts that they have undertaken on A.T.'s

behalf. Appellant N.T.'s Br. p. 32. Father concludes his appellate arguments by asserting that

> This is the kind of case that calls for Appellate relief, and an establishment of a reasonable outcome that recognizes that parents facing an unwinnable situation do not need the State to pile on at the moment of crisis, instead of providing grace and help. Nineteen months after filing a CHINS petition, five full days of heated trial, and intensive preparation of an appeal on an 888 page transcript later, finds us all exactly where [Parents] suggested was needed for [A.T.] on the day of removal, and what was predicted by the last residential therapist just three months before the CHINS case opened – with [A.T.] in a residential placement because of her unremedied behaviors.

Appellant N.T.'s Br. p. 33.

### 3. *The Juvenile Court's Conclusions are Not Supported by the Record*

[39] The juvenile court appears to have relied heavily on its findings that Parents believed A.T.'s problematic behaviors were nothing more than attention-seeking and the fact that Parents "unilaterally" took A.T. off of her medication for a period between 2016 and 2018 as its main reasons for adjudicating A.T. to be a CHINS under Indiana Code sections 31-34-1-1 and -2. As is discussed above, the juvenile court's reliance on these findings is erroneous as the findings are not supported by the evidence. Further, despite the juvenile court's determination that Parents had displayed a pattern of disregarding the recommendations of service providers, the record indicates that Parents had not unilaterally made decisions regarding A.T.'s care, but rather made decisions after consultation with various service providers in both Missouri and Indiana.

The fact that some service providers might not have agreed with all of the decisions made regarding A.T.'s care over a number of years does not, in and of itself, support a determination that Parents neglected A.T.'s needs.

[40] Father argues that "[t]he evidence is at best equivocal in that no pattern of behavior corresponds to Child either being in or out of medication management or counseling." Appellant N.T.'s Br. p. 30. The juvenile court's factual findings indicate that Father is correct in this regard. The juvenile court's conclusion that A.T. is a CHINS under Indiana Code sections 31-34-1-1 and -2 are not supported by the record. Thus, while the juvenile court's determination that A.T. is a CHINS pursuant to Indiana Code section 31-34-1-6 remains intact, we reverse the juvenile court's determination that A.T. is a CHINS under Indiana Code sections 31-34-1-1 and -2.

[41] The judgment of the juvenile court is affirmed in part and reversed in part.

Riley, J., and Weissmann, J., concur.